UNITED STATES OF AMERICA *v.* AXMAN.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 242. Argued March 9, 1914.—Decided May 25, 1914.

Where, after default of the original contractor, the contract is relet, the original contractor is not bound for difference unless the contract as relet is the same as the original contract.

Where a contract for dredging requires the dredged material to be deposited in a specified location, changes made as to the location for depositing such materials amount to such an important variation that the first contractor cannot be held for difference. *United States v. McMullen,* 222 U. S. 460, distinguished.

Change in location for depositing material dredged under a government contract is not to be regarded as a minor change; it is clearly an important one.

193 Fed. Rep. 644, affirmed.

THE facts, which involve the rights and liabilities of a contractor and his surety under a contract with the Government, are stated in the opinion.

*The Solicitor General* for the United States:

After the annulment of the contract by reason of the contractor's default it became the duty of the Government to complete the work at reasonable cost and to diminish

as far as possible the loss which it had suffered and for which it proposed to hold the defendants liable.

. The change which was made in the terms was to the manifest ease of the defendants and lessened the cost of the work as relet without increasing in any particular the burden which either the principal or the surety had assumed.

Where the Government relets a contract, the sureties— and *a fortiori* the principal—are not relieved because there are differences in the terms which diminish the cost of the work as relet. See *United States* v. *McMullen*, 222 U. S. 460, which is controlling and decisive of the case at bar, in fact, the similarity of incident and issues is unique. This decision followed in time the first opinion of the Circuit Court of Appeals herein, and it may fairly be assumed that the latter court was as yet unadvised of it at the time of its final action.

*Mr. Frank W. Aitken,* with whom *Mr. John R. Aitken* was on the brief, for appellee Axman:

The action is not for damages, but is on a contract to pay the cost of certain work.

There can be no recovery except for completing the work.

. The change made was material; the Government did not proceed to complete the contract, but did other work instead.

The contractor's rights after annulment are subject to the same rules as those of a surety.

The change was detrimental and new obligations were imposed.

The contract did not authorize such change unless made by agreement.

In support of these contentions, see *Alcatraz Masonic Ass'n* v. *U. S. F. and G. Co.*, 85 Pac. Rep. 157–8; *Am. Bonding Co.* v. *United States,* 167 Fed. Rep. 910; *Am. Bonding Co.* v. *Gibson County,* 127 Fed. Rep. 671; *American*

*Surety Co.* v. *Woods,* 105 Fed. Rep. 741; *S. C.,* 106 Fed. Rep. 263; *Axman* v. *United States,* 47 Ct. Cl. 537; *S. C.,* 48 Ct. Cl. 376; *Burnes* v. *Fidelity Co.,* 96 Mo. App. 467; *Calvert* v. *London Dock Co.,* 2 Keen, 638; *Chesapeake Co.* v. *Walker,* 158 Fed. Rep. 850; *Durrell* v. *Farwell,* 88 Texas, 98; 30 S. W. Rep. 539; *Holme* v. *Brunskill,* L. R. Q. B. Div. 495; *Prairie Bank* v. *United States,* 164 U. S. 227; *Miller* v. *Stewart,* 2 Cr. 700; *O'Connor* v. *Bridge Co.,* 27 S. W. Rep. 251, 983; *Reese* v. *United States,* 9 Wall. 13; *Reissaus* v. *White,* 106 S. W. Rep. 607; *State* v. *Medary,* 17 Oh. St. 565; *Taylor* v. *Johnson,* 17 Georgia, 521; *United States* v. *Corwine,* Fed. Cases, No. 14,871; *United States* v. *Freel,* 92 Fed. Rep. 306; *United States* v. *Freel,* 186 U. S. 309; *United States* v. *Freel,* 99 Fed. Rep. 239; *United States* v. *Mc-Mullen,* 222 U. S. 460; *United States* v. *O'Brien,* 220 U. S. 321; *United States* v. *Robeson,* 9 Pet. 319, 327; *White* v. *Sisters of Charity,* 79 Ill. App. at 649.

*Mr. Edward Duffy,* with whom *Mr. Jesse W. Lilienthal* was on the brief, for appellee American Bonding Company:

The contract and evidence excluded did not tend to prove issues.

The contract fixed method of proving damages.

No change could be made after annulment. See *Baer* v. *Sleicher,* 163 Fed. Rep. 129; *United States* v. *Freel,* 186 U. S. 309; *United States* v. *McMullen,* 222 U. S. 460; *United States* v. *O'Brien,* 220 U. S. 321.

MR. JUSTICE DAY delivered the opinion of the court.

Suit was brought by the United States to recover on a contract between the United States and Axman with the American Bonding Company, as surety, for dredging in San Pablo Bay, California. The first trial resulted in a judgment for the United States, which was reversed by the Circuit Court of Appeals for the Ninth Circuit. 167 Fed.

Rep. 922. On new trial judgment directed in favor of the defendants was affirmed by the Circuit Court of Appeals (193 Fed. Rep. 644), and the case is brought here.

It appears that on the twenty-fifth of August, 1902, the United States called for bids for dredging in San Pablo Bay. On September 30, 1902, Axman submitted his proposal to furnish all the plant, labor and materials for the work. On November 21, 1902, a written contract was entered into between Axman and the United States for the work. Axman was to do such dredging in the Bay as might be required by the Government engineer in accordance with certain specifications for the sum of 11.44 cents per cubic yard. The specifications, which were made a part of the contract, contained, among others, the following paragraphs:

"35. The shoal to be dredged is in San Pablo Bay, California, is about five miles in length, and has a least depth of 19 feet at low water. It extends from Pinole Point to Lone Tree Point, and is distant $1\frac{1}{4}$ to $1\frac{1}{2}$ statute miles N. W. of the points referred to. The average depth of the excavation is about 9 feet.

"36. The work to be done is to excavate a channel through the shoal, to have a bottom width of 300 feet, a depth of 30 feet at mean low water, and a length of about 27,000 feet; to deposit the spoil as near the south shore as practicable, within lines drawn between Pinole Point and Lone Tree Point, at such places as may be designated by the Engineer officer in charge; and to impound the material behind bulkheads or dykes of suitable construction, subject to approval by the Engineer officer in charge, which must be built and maintained by and at the expense of the contractor during the life of the contract.

"39. All dredged material is to be deposited within the limits of the area described in paragraph 36. The method of deposit will be subject to approval by the Engineer officer in charge.

"31. The contractor will be required to commence work under the contract within sixty days after the date of notification of approval of the contract by the Chief of Engineers, U. S. Army, to prosecute the said work with faithfulness and energy, and to complete it within twenty-eight (28) months, after the date of commencement.

"46. The work must progress at the rate of at least 100,000 cubic yards per month, and to entitle the contractor to the monthly payments provided for in paragraph 30 of these specifications, an average of not less than 100,000 cubic yards per month must have been dredged and deposited; the calculation of averages to be made from the day on which the contract requires the work to be commenced."

A place for the building of the bulkhead was designated in accordance with paragraph 36 of the specifications, and Axman built a bulkhead 2400 feet long, consisting of two arms, one of 1800 feet and one of 600 feet. The outlines of the channel to be dredged were also indicated. Axman began work and continued intermittently until December 24, 1903, up to which date he had removed 196,000 cubic yards, but had not in any month removed 100,000 cubic yards. It appears that the barges in Axman's outfit were of such draft that they were unable to get behind the bulkhead except at high tide; that he applied to the engineer officer in charge to be allowed to dump the spoil on the north side of the channel or down at "The Sisters," but permission was refused him so to do. This place is the one where the material was subsequently dumped when the contract was relet.

Paragraph 4 of the contract provides:

"4. If, in any event, the party of the second part shall delay or fail to commence with the delivery of the material or the performance of the work on the day specified herein, or shall, in the judgment of the Engineer in charge, fail to prosecute faithfully and diligently the

work in accordance with the specifications and requirements of this contract, then, in either case, the party of the first part, or his successors legally appointed, shall have power, with the sanction of the Chief of Engineers, to annul this contract by giving notice in writing to that effect to the party (or parties, or either of them) of the second part, and upon the giving of such notice all payments to the party or parties of the second part, under this contract, shall cease, and all money or reserve percentage due, or to become due the said party or parties of the second part, by reason of this contract, shall be retained by the party of the first part until the final completion and acceptance of the work herein stipulated to be done; and the United States shall have the right to recover from the party of the second part whatever sums may be expended by the party of the first part in completing the said contract in excess of the price herein stipulated to be paid the party of the second part for completing the same, and also all costs of inspection and superintendence incurred by the said United States, in excess of those payable by the said United States during the period herein allowed for the completion of the contract by the party of the second part, and the party of the first part may deduct all the above mentioned sums out of or from the money or reserve percentage retained as aforesaid; and upon the giving of the said notice, the party of the first part shall be authorized to proceed to secure the performance of the work or delivery of the materials by contract, or otherwise, in accordance with law."

There are other paragraphs permitting the Chief of Engineers, if he sees fit, to employ additional plant or purchase materials, etc., to insure the completion of the work within the time specified, charging the cost thereof to the contractor, such provision, however, not to be construed so as to affect the right of the Government to annul the contract. The Government, on the ground that Axman

had failed to comply with the requirements of the specifications, proceeded under the provisions of paragraph 4, wherein it will be seen it was stipulated that the United States might have the right to recover from the party of the second part whatever sums might be expended by the party of the first part in completing the contract.

When the contract was relet it was advertised in the alternative, giving the contractor the right to deposit spoil where Axman was required to deposit it within lines drawn between Pinole Point and Lone Tree Point at such places as might be designated by the engineer officer and to impound the material behind bulkheads of suitable construction, subject to the approval of the engineer officer, to be built and maintained at the expense of the contractor, or to deposit the spoil in water exceeding 50 feet in depth lying within the area bounded by lines drawn from The Sisters to Point San Pablo, thence to Marin Islands, and thence back to The Sisters. The bid accepted and the contract made provided for the deposit of the spoil in deep water at The Sisters. At the trial the Government offered evidence of witnesses as to the fairness of the price paid the North American Dredging Company, the new contractor, under the relet contract and as to whether it cost more to dredge and dump the spoil behind the line drawn between Pinole Point and Lone Tree Point than to dredge and dump in deep water. All of the opinion evidence offered by the Government was received by the court under objection, and at the conclusion of the case ruled out and the jury instructed to render a verdict for the defendants.

It is thus apparent that the real question in the case is whether the contract relet for the completion of the work under paragraph 4 of the original contract was a contract for work for which Axman was bound and which he had failed to carry out, or whether it was a different contract and therefore one for which Axman and his surety cannot

be held and which cannot be used for the measure of recovery for breach of the original contract.

The Government insists that the main purpose of the original contract was to secure the dredging of the channel and that the place of dumping the spoil was but incidental. The contract, however, does not so read. It specifically made the place of dumping the spoil an essential and particular term of the contract. It is not necessary to inquire into the reason which actuated the Government in making this requirement. It may be that it desired the spoil to be retained at a place outside of the channel and that such retention was a better way of doing the work than to deposit the spoil in deep water. It is enough to say that the contract, part of which we have heretofore set forth, specifically provided for dumping the spoil behind the bulkhead. As we have said, the engineer refused permission to dump the spoil at a place other than that designated in the specifications. This position of the engineer was warranted by the terms of the contract, for by paragraph 36 of the specifications the depositing of material and impounding it behind bulkheads as provided in the contract were made an essential part of the work to be done, and it is provided by specification 38 that material deposited otherwise than as specified will not be paid for, and by paragraph 39 that all dredged material was to be deposited within the area specified in paragraph 36, and by paragraph 53 that all material must be excavated and deposited under the supervision of the engineer officer in charge. It therefore follows that not only was Axman to dredge the channel as required by the contract, but he was to deposit the spoil as therein specified. Dredging the channel would not be enough to show performance of his contract, unless he complied with the other material requirement as to the deposit of the spoil. The new contract contained a different stipulation as to the dumping of the spoil. Upon the showing made in this case we think the change in the

place of dumping the spoil was very material, and could. not be made consistently with the terms of the agreement under which Axman undertook to perform the work or be liable as stipulated in paragraph 4.

Both sides refer to the case of *United States* v. *McMullen*, 222 U. S. 460. In that case a suit was brought upon a contract and bond, the contract providing for certain dredging. The contractor asked for leave to dump the spoil in deep water instead of on shore, which was at first refused, but afterwards granted. The contractor, however, failed to do the work and abandoned it. The Navy Department declared the contract void, and, after advertising, entered into a new contract. The defense principally made and treated of in the opinion of the court rested upon the alleged extension of time which it was contended worked a discharge of the surety. After disposing of that question in favor of the Government, this court said (p. 471):

"The objection that the second contractor does not appear to have completed the work intended to be accomplished by the first, that is to have made a channel of a certain depth, does not impress us. The first contract was for certain work for a certain object, but limited and subject to change as the appropriations might require. The second was for the same on the same plans and specifications, the only difference being in the parties, the price, and the liberty given to the second contractor to dump in deep water, which diminished the cost. In the first contract the Government reserved an absolute right of choice in this regard. Whether the object of the contract was attained is immaterial, so long as the work done towards it was work that the first contractor had agreed to perform."

We thus observe that in the *McMullen Case* it was found that the liberty given to the second contractor to dump in deep water did not change the contract, because in the

first contract the Government reserved an absolute right of choice in this regard. In the present case there was no such right of choice. The place of dumping spoil was made as we have said, a specific requirement of the contract. Under paragraph 6 such changes as are here involved must be agreed upon in writing by the contracting parties, the agreement setting forth clearly reasons for the change, giving quantity and prices, to take effect only upon the approval of the Secretary of War. Minor changes are provided for in paragraph 58 of the specifications, but clearly such an important change as this one has proven to be is not of that character.

In the *McMullen Case*, in treating of the right reserved in the first contract giving the Government an absolute choice of the dumping ground, it was concluded, "whether the object of the contract was attained is immaterial, so long as the work done towards it was work that the first contractor had agreed to perform." We are clearly of the opinion in this case that the work done under the second contract was not the work which the first contractor had agreed to perform. While it is true it accomplished the dredging of the channel in the same Bay, it did this with a disposition of the spoil not permitted under the first contract and in a material matter was different from the contract first entered upon.

We reach the conclusion that the Circuit Court of Appeals rightly decided this case, and its judgment is accordingly

*Affirmed.*