## SOUTHERN SURETY CO. et al. v. AMERICAN CONST. CO. et al.

No. 1386—5564.

Commission of Appeals of Texas, Section A.
March 4, 1931.

King, Battaile & Dutton and Fouts, Amerman, Patterson & Moore, all of Houston, for plaintiffs in error.

King, Wood & Morrow, J. E. Price, and Wm. E. Loose, all of Houston, for defendants in error.

HARVEY, P. J.

This is a suit brought by the American Construction Company against Oswald J. Lassig and his surety, the Southern Surety Company, on a surety bond.

The construction company was the contractor for the construction of the Herman Hospital in Houston. On July 26, 1923, the company sublet to Lassig a portion of the work, consisting of the supplying of stone for the construction of the building; and the construction company and Lassig entered into the contract which is involved in this suit. A bond was given to the construction company by Lassig, as principal, and the Southern Surety Company, as surety. The condition of the bond reads: "Now, therefore, the condition of the foregoing obligation is such that if the said principal shall well and truly indemnify and save harmless the said obligee from any pecuniary loss resulting from the breach of any of the terms, covenants and conditions of said contract on the part of said principal to be performed, then this obligation shall be void; otherwise to remain in full force and effect in law."

Under the contract secured by this bond, Lassig was bound to supply the construction company with approximately 10,000 cubic feet of finished and carved stone. The stone was required to be delivered on the building site, within 160 working days from the date of the contract, at the rate of not less than 2,000 cubic feet per month, beginning August 1, 1923. The contract between Lassig and the construction company provided for certain advancements of money to be made by the company to Lassig in order to enable him to carry on the work. These advancements were duly made by the company as called for by the contract: The contract also required Lassig to furnish certain setting drawings and models to be used by him in doing the work. He procured the construction company to prepare these setting drawings and models for him. The construction company sues herein for the amount of said advancements and the value of the setting drawings and models, and also for stipulated damages for delay in performance of the work. Lassig, in his answer to the suit, set up a cross-action against the construction company for damages alleged to have been suffered by him as a result of alleged wrongful acts of the construction company in wantonly condemning and rejecting a large quantity of stone in November and December of 1923, which Lassig had finished and prepared for delivery. These alleged wrongful acts of the construction company are also set up as a defense to the company's suit. The Southern Surety Company entered various defenses against liability under the bond, which will be noticed further on. The case was tried to a jury, and upon their verdict on special issues, and the independent fact findings of the trial court, that court rendered judgment that the construction company take nothing, and that Lassig recover damages on his cross-action, in an amount stated in the judgment. The Court of Civil Appeals [20 S.W.(2d) 797] reversed this latter part of the judgment and remanded the cause for a retrial of Lassig's cross-action. The latter court also reformed that part of the judgment which denied a recovery by the construction company, so as to allow a recovery by that company against Lassig, of the amount of the said advancements and the value of the setting drawings and models, and, as so reformed, the judgment of the trial court respecting the construction company's suit was affirmed. In so far as the trial court's judgment was in favor of the Southern Surety Company, it was reversed by the Court of Civil Appeals, and the cause, as between the surety company and the construction company, was remanded. These two companies, respectively, applied for writ of error, and both applications were granted.

Article 4 of the Lassig contract provides as follows: "Should the sub-contractor (Lassig) at any time * * * fail in the performance of any of the terms, stipulations and agreements obligatory upon said subcontractor, contained in this agreement, then in such event, at the option of the contractor (the Construction Company), if such failure be continued four days after notice in writing to the subcontractor, or anyone representing it on the work, such notice stating the nature of the violation of the contract, the contractor (the Construction Company) may proceed thereupon to complete the work, under the terms of said contract, at the cost and expense of the said sub-contractor, or, at the option of the contractor, the work may be re-sublet at the cost and expense of said subcontractor. * * *"

Lassig failed to supply the stone at the rate of 2,000 cubic feet per month, and, while he was in default in this respect, the Construction Company, on November 19, 1923, wrote and delivered a letter to Lassig and delivered a copy thereof to the Southern Surety Company. In this letter the construction company gave notice of Lassig's default, and declared that the construction company "had elected to proceed to supply the stone for the Herman Hospital, which under your contract of July 26, 1923, you agree to furnish. * * * The work will be completed at your cost and expense. We will either supply the stone ourselves or resublet the contract, as to us may, under all the circumstances, seem most advantageous."

Upon receiving this letter, Lassig immediately appealed to the construction company to allow him to continue work under the contract in an effort to supply the required amount of stone. The construction company allowed him to do this, and thereafter he supplied a small quantity of stone in November; about 200 cubic feet in December; about 53 cubic feet in January; and none thereafter. The total quantity of stone supplied by Lassig under the contract was 1,442.6 cubic feet. On February 15, 1924, which was some 10 days before 160 working days from the date of the contract had elapsed, the construction company wrote another letter to Lassig, a copy of which was delivered to the Southern Surety Company. The body of this letter reads as follows:

"This is to serve formal notice to you that under terms of our contract with you dated July 26th, 1923, wherein you were to furnish the cut stone for Hermann Hospital building which we have under contract with the Trustees of Hermann Estate, is now cancelled because of your failure and default in the carrying out of the terms of the contract, you having failed to supply the stone at the time and in the quantities required by the contract.

"We gave you notice of the cancellation of this contract on November 19th, 1923, but since that time we accepted and paid you for a small amount of material which you had on hand and in the course of manufacture for the purpose of showing you every consideration possible. The work will be completed at your cost and expense as provided in the contract."

The construction company thereupon proceeded, on the same day, to enter into a contract with the Bedford-Carthage Company by which the latter became bound to supply and did subsequently supply the remainder of the designated quantity of stone called for by the Lassig contract, at about the same cost as if Lassig had completed his contract.

The surety company contends that it was released from its engagement as surety because of a change in the terms of the Lassig contract in this: After the Lassig contract was made, and the surety bond was given, the construction company, with Lassig's consent, made progress payments to the latter, while he was going forward with the work, in amounts less than stipulated in the contract. This did not effect a change in the surety company's engagement or in any wise modify its terms. The action of Lassig and the construction company in this respect affected only the portion of the earned sums which, under the stipulation in question, was due and payable to Lassig. As to such portion, the latter could require payment or not, as he chose. It was no concern of the surety company that Lassig accepted payments of less amounts than said company had agreed should be made to him.

The surety company claims that the notice which was given by the construction company, in November of 1923, to the effect that the latter company had elected to complete the Lassig contract, constituted an election which could not be recalled without the surety's consent; and that, because the construction company allowed Lassig to proceed thereafter in the performance of the work, a new contract between the two arose, and that the surety company stands released from the suretyship contract. The notice did not, in our opinion, constitute an irrevocable election. It was but a step towards the taking over of the work for the purpose of completing it, but the construction company proceeded no further in that direction at that time. Lassig was allowed to proceed further with the prosecution of the work. The construction company thus waived, as it had the right to do, its declared purpose to take over the work at that time, and complete it under the provisions of article 4 of the contract. The bare fact of this waiver did not work a release of the surety. Smith v. Molleson, 148 N. Y. 241, 42 N. E. 669.

The surety company further contends that the construction company's suit is based on the theory that the latter company, in taking over the work in pursuance of its letter to Lassig of date February 15, 1924, did so under the terms of the Lassig contract, and therefore was required to complete the work there called for. In this the surety company is correct. The language of said letter clearly shows an election on the part of the construction company to stand on the contract, and to assume the power granted by the provisions of article 4 of the contract, rather than to treat performance of the contract as ended on account of breach of the contract by Lassig. In the opening sentence of the letter it is said: "Under the terms of our contract with you * * * is now cancelled." There are no other terms of the contract than those contained in article 4, to which this language could relate. On the other hand, it is not to be supposed, under the circumstances shown, that the company meant to rescind the contract in its entirety and thus absolve the several parties of all liability. The letter, taken as a whole, including the concluding sentence thereof which reads "The work will be completed at your cost and expense as provided in the contract," shows with reasonable clearness that the purpose of the company was to go forward with the contract and complete the work under the authority conferred on the company by the provisions of article 4 of the contract.

The surety company contends that, because the stone called for by the Bedford-

Carthage Contract, and supplied by that company, was not "Duval Texas Limestone from Travis County, Texas," such a change was effected in respect to the surety company's engagement as released the company. By the terms of the Lassig contract, he (Lassig) was bound to furnish, under the direction of the supervising architect, and to his satisfaction, the specified quantity of "Duval Texas Limestone from Travis County, Texas." Said contract further provides that: "It is understood that the subcontractor (Lassig) expects to procure the stone required under this contract from his stone quarry in Travis County, near McNeill, Travis County, Texas," etc. The stone called for by the Bedford-Carthage contract, and which was furnished by that company for the completion of the building, was limestone from a quarry at Cedar Park, in Williamson county, Tex., which quarry was located about fifteen miles from Lassig's quarry. The stone from the Cedar Park quarry is shown to have been in all material respects the same as that from the Lassig quarry at McNeill. Both were taken from the same strata, and were of the same character and quality. The stone from the Cedar Park quarry met the approval of the supervising architect as fulfilling the requirements of the Lassig contract. The provisions of article 4, interpreted in the light of the circumstances of the case, reasonably contemplate the procuring of the stone, by the sublessee or the construction company, from some quarry other than Lassig's. The contention of the surety company, in this particular, is without merit.

The Lassig contract differed from the Bedford-Carthage contract in the following particulars: (1) Under the first contract, Lassig had the privilege of making the required carvings after the stone was put in place in the building during the construction of the building; whereas this privilege was not allowed to the Bedford-Carthage Company, under the second contract. (2) The first contract provided for semimonthly progress payments of 85 per cent. of the earned sum; the second contract called for monthly progress payments of 67½ per cent. of the earned sum. (3) The first contract required the stone to be delivered within a period of 160 working days, in monthly installments of not less than 2,000 cubic feet; the second contract provided for deliveries to be made "as fast as possible, final delivery in about four months from date" of the second contract.

The Southern Surety Company contends that, because the first contract in the particulars just mentioned was not followed under the second contract, the surety company stands released from the bond sued on. This calls for a consideration of the question as to whether or not liability under the bond was conditioned upon these provisions of the first contract being followed in resubletting the uncompleted portion of the work under article 4 of the contract. There is no provision in the surety bond, or in other portions of the contract than article 4, which so prescribes. Such a condition, if found at all, must be found in the language of article 4 itself, which has been quoted. It is not thought that the language of said article, when construed in the light of the whole contract, fairly implies a purpose to impose this condition. It appears with reasonable certainty, when the language of the article is so construed, that the "work" contemplated by the parties, and with respect to which they framed this article, was the supplying of the finished and carved stone comprehended by the contract. It was this "work" which the construction company was authorized to complete or cause to be completed. The uncompleted portion of this "work" was completed by the Bedford-Carthage Company. With reference to the completion of the work, the diligence of the latter company and of the construction company is unquestioned. The surety company relies, for support of its contention in this respect, on a line of decisions which includes U. S. v. Axman, 234 U. S. 36, 34 S. Ct. 736, 58 L. Ed. 1198; American Bonding Company v. United States (C. C. A.) 167 F. 910, and similar cases, in which the question of liability under a contractual provision similar to article 4 of the Lassig contract was involved. But a distinguishing feature of controlling importance, which is common to those cases, is the fact that the work done by the second contractor differed in substantial respects from the work to which the first contractor was bound.

██ We now take up the contention of the construction company. That company contends that, under the terms of the Lassig contract, it is entitled to recover stipulated damages in the sum of $50 per day for every day, prior to the taking over of the work by the company, that Lassig was in default in supplying stone at the rate of 2,000 cubic feet per month. The provisions of the contract upon which this claim is based read as follows: "Subject to the provisions hereof, this subcontractor (Lassig) shall deliver all of said stone upon the building within one hundred and sixty working days from the date hereof, and beginning with the first day of August, 1923, this sub-contractor shall begin the delivery of said stone on said building site at the rate of not less than 2000 cubic feet per month, that is, the first 2000 cubic feet are to be delivered on or before September 1, 1923. It is agreed that subject to the provisions hereof, that should this sub-contractor fail to complete the work, either the delivery on the building site or/and the carving herein contracted for, within the time required by this contract, and time being of the

essence of the contract, this sub-contractor shall pay to the contractor (the Construction Company) Fifty ($50.00) Dollars per day as liquidated damages, and not as a penalty, for each and every day the work shall remain uncompleted after the time herein fixed for the completion of same." We have concluded that the meaning of this language, does not comprehend, as an event giving rise to stipulated damages, the failure to make the deliveries in monthly installments, as prescribed. It fairly appears from the language of the provision that the parties, in providing for stipulated damages, were treating as a composite whole the various deliveries of stone which Lassig was required to make. Delay beyond the specified time, in bringing this composite whole to completion, was the only event, in respect to the delivery of the stone on the building site, which was regarded by the parties as giving rise to damages in the sum stipulated. This brings up the question as to whether or not the taking over of the work by the construction company, before the specified time for its completion arrived, renders the provision for stipulated damages inapplicable.

If the default of Lassig in meeting his obligations was not brought about by the wrongful acts of the construction company, as Lassig alleges, then the latter company, because of Lassig's default, rightfully took over the work and had it completed under the contract. The work having been completed under the contract, no reason is perceived why Lassig and his surety should not remain bound for stipulated damages for such delay, beyond the specified time, as proximately resulted from Lassig's default, unmixed with any default on the part of the construction company or of the Bedford-Carthage Company, in respect of the completion of the work. This liability comes fairly within the purview of the stipulation under consideration, and of the terms of the surety bond.

The question arises as to the proper disposition of the case. The Court of Civil Appeals correctly reversed the judgment of the trial court in the respects it did; but in so far as the judgment of the Court of Civil Appeals, in effect, precludes the construction company from a recovery of stipulated damages on account of delay, it is erroneous. The ends of justice will be better subserved, however, if the whole case be retried. We therefore recommend that the judgment of the trial court, and that of the Court of Civil Appeals, be reversed in all respects, and that the cause be remanded.

CURETON, C. J.
Judgments of the district court and Court of Civil Appeals are both reversed, and the cause remanded to the district court, as recommended by the Commission of Appeals.

We approve the holdings of the Commission of Appeals on the questions discussed in its opinion.