The **UNITED STATES of America,**
Plaintiff,

v.

The **HAWTHORN MANUFACTURING COMPANY, Defendant,**

**American Surety Company of New York, Defendant, and Third-Party Plaintiff,**

**Fred N. PIERSON, Third-Party Defendant.**

No. 10629.

United States District Court
W. D. Missouri, W. D.

Jan. 30, 1962.

Edward L. Scheufler, U. S. Atty., for plaintiff.

Clifford B. Kimberly, Kansas City, Mo., for American Surety Co. of New York.

R. Carter Tucker, of Tucker, Murphy, Wilson, Lane & Kelly, Kansas City, Mo., for defendant and third-party plaintiff.

Fred N. Pierson, Kansas City, Mo., for third-party defendant.

DUNCAN, District Judge.

In October, 1956, plaintiff instituted this suit against the defendants Hawthorn Manufacturing Company and American Surety Company, to recover the sum of $29,259.64 for breach of contract entered into by the Hawthorn Manufacturing Company to supply the Army Air Force with certain materials which will hereafter be described.

The contract was entered into on August 31, 1949, and under the terms thereof, the defendant Hawthorn Manufacturing Company agreed "to furnish the Materiel Command, United States Air Force, Wright-Patterson Air Force Base, Dayton, Ohio, 8876 Bomb Rack Releases and Spares (left hand) and 7562 Bomb Rack Releases and Spares (right hand) in accordance with Air Force specification No. 24981, for the price of $9.96 each, or a total contract consideration of $163,722.48."

On September 27, 1949, defendant American Surety Company entered into a performance bond on behalf of the Hawthorn Manufacturing Company binding said surety unto the plaintiff in the penal sum of $47,803.00.

The Third Party Defendant, Fred M. Pierson, principal officer of the corporate defendant, executed the application for the bond on behalf of the corporation, and also signed the application as an individual. As a result thereof, the defendant American Surety Company was granted leave to and did file a third party complaint against Pierson, alleging that if it should be held liable under the bond, it should have judgment for the amount thereof against the third party defendant.

The charter of the Hawthorn Manufacturing Company was forfeited between the time of the awarding of the contract and the filing of the suit, and it did not file answer to the Complaint.

The company failed to perform any portion of the contract and the Air Force, pursuant to bids, purchased the material from the R. E. Dye Machine and Supply Comppany, Breckenridge, Texas, at an excess cost of $29,259.64. The Hawthorn Manufacturing Company contract was terminated and cancelled on August 18, 1950.

Following the cancellation of the contract and the demand upon the corporate defendant and the Surety Company for the payment of the amount of the excess, an appeal was taken by the Hawthorn Manufacturing Company, and a hearing was had on such appeal by the Armed Forces Board of Contract Appeals at the office of the Assistant Secretary of the Army in Washington, D. C. on November 27, 1951. The finding on appeal was adverse to the appellant, and since all of the administrative remedies provided for under the statute had been complied with, this action was brought.

The case is before this court on Stipulation[1] filed on February 16, 1961, and a Supplemental Stipulation[2] filed on April 25, 1961.

Although in paragraph 4 of the original stipulation the parties reserved the right to offer testimony when the case was to be called on Monday, February 20, 1961, no testimony was actually offered and the matter is now before this court on the record as stipulated, which includes all of the documents that were before the Hearing Commissioner, and upon which the final appeal was heard.

In the hearing on appeal, apparently the principal defense was that the contractor had been misled because the Air Force had failed to reveal to it the information that the solenoid, one of the mechanical elements of the release, could not be manufactured without tremendous loss resulting from rejections on the part of the Government. In this court, however, the defendant Surety Company broadened the scope of its defense and denies liability because of the following acts of the Government:

"1. For failure to receive timely and reasonable notice of delay in performance, impending default and the resulting failure of opportunity to assist the Contractor in completing its contract or to assume completion by arrangement with others.

"2. By substantial and material changes in specifications and conditions in soliciting bids and reletting the contract.

"3. Arbitrary and capricious refusal to permit change and substitution in the solenoid specified and thereafter permitting (if not directing) the identical change immediately after reletting the contract.

1. [Caption and signatures omitted]
"STIPULATION"
"Come now the parties hereto and agree and stipulate that the following facts and documents may be and are admitted in evidence, subject only to such objections as to materiality or relevancy as may be made at the trial of this case:

"1. The following documents, all of which are attached to the complaint, are admitted in evidence and constitute a portion of the record in this case:

"(a) Attachment 'A,' the original contract entered into between the defendant Hawthorn Manufacturing Company and the plaintiff, providing for the manufacture of Bomb Rack Releases and Spares, in accordance with Air Force specifications;

"(b) Attachment 'B,' the performance bond as executed by the defendant American Surety Company of New York;

"(c) Attachment 'C,' the written opinion of Mr. Gerritt W. Wesselink of the Armed Services Board of Contract Appeals, Washington, D. C., dated April 29, 1952, denying the defendants' appeal in this case.

"2. The complete transcript of proceedings before the Armed Services Board of Contract Appeals, Washington, D. C., on Tuesday, November 27, 1951, together with appropriate exhibits referred to therein, is admitted in evidence in this case.

"3. Certificate of Indebtedness issued by the General Accounting Office, dated February 24, 1956, directed to The Hawthorn Manufacturing Company. % Fred N. Pierson, President, 1207 Stratford Road, Kansas City, Missouri.

"4. It is the intention of all parties to this proceeding to submit this case to the Court on briefs and the above record, although all parties reserve the right to offer testimony when this case is called on Monday, February 20, 1961."
[Signatures omitted]

2. (CAPTION OMITTED)
"SUPPLEMENTAL STIPULATION"
"Come now the parties hereto and agree and stipulate that the following documents may be and are admitted in evidence, in addition to the matters included in the original stipulation under items 1 to 4 inclusive, subject only to such objection as to materiality or relevancy as may be made at the time of the trial of this cause:

"A. Government Exhibit D, letter June 13, 1950, two pages.

"B. Letter to Dye November 15, 1950 signed by Robert Beck, one page.

"C. Letter dated April 26, 1950 from Leland Inc. to Commanding General, three pages.

"D. Letter dated September 10, 1951 from Leland to Hawthorn, three pages."

(Signatures omitted)

"4. By failure to award the contract to the low bidder on reletting when it had a substantially lower bid.

"5. By failure to divulge to the contractor, at or before the original bids were solicited information concerning previous experience with other suppliers resulting in a high rate of rejections of the solenoid specified under the subject contract."

There is no question about the failure of the corporate defendant to carry out any part of the terms of the contract, so in discussing the question the court will confine itself to those grounds which have been enumerated above as an excuse or reason for failure to perform the contract.

The defense which may be applied only to the Surety Company concerning notice must be resolved against it. There is no provision in the contract for any specific notice concerning the various steps to be taken by the contractor in the carrying out of its contract. Much correspondence and several conferences were held between the contractor and the Air Force representatives concerning the performance of the contract, and never at any time was the contractor, so far as its physical plant was concerned, able to carry out any part of the contract.

When these facts became apparent, notice was given to the contractor and notice of the final cancellation of the contract was given to the surety. I think it cannot now complain that it did not have knowledge that never at any time after the execution of its performance bond was there even a serious attempt on the part of the contractor to perform any part of the contract.

Defense No. 5 should next be considered. It is failure of the Government "to divulge to the contractor, at or before the original bids were solicited information concerning previous experience with other suppliers resulting in a high rate of rejections of the solenoid specified under the subject contract."

There isn't a suggestion in the record anywhere that any request was ever made by the contractor of the Air Force concerning such information. On the contrary, the evidence clearly reveals that Hawthorn Manufacturing Company relied entirely upon its investigation and the knowledge of its own engineers.

It is defendants' contention that it was not until after the bid was awarded and the contractor began to investigate the source of materials and equipment needed in the manufacture of the device that it claimed to have learned that a very high percentage of the solenoid elements had been rejected by the Government under prior contracts. It feared that if it manufactured the solenoid in accordance with the specifications, the probable number of rejections would result in disastrous financial loss.

I find it difficult to follow the reasoning of the defendants in this respect for two reasons. First, if the solenoid was manufactured in accordance with the specifications, the contractor would not have faced the problem of any loss resulting from rejections. That must be accepted as a legal conclusion.

Second, the evidence, so far as the transcript reveals, does not show excessive rejections. There is some evidence that a solenoid of a different model (A-4) which was attempted to be worked over and converted into the type A-5 solenoid, did result in some rejections, but this evidence does not apply to the solenoid described in the specifications upon which the contractor bid.

Furthermore, I know of no rule of law other than actual fraud that would require the procurement officers to reveal to the bidders the information which it says was so vital to the carrying out of the contract, and there is no evidence here of any such fraud or deception.

The only conclusion to be drawn from the evidence is that the contractor relied upon its engineer to advise it with respect to its bid, and cannot now be heard to complain that it was

misled by failure of the Government to reveal this information to it.

Next, we come to item No. 3, "Arbitrary and capricious refusal to permit change and substitution in the solenoid specified and thereafter permitting (if not directing) the identical change immediately after reletting the contract."

On February 15, 1950, a letter of inquiry was addressed by the contractor to The Commanding Officer at Wright-Patterson Air Force Base in which the question of the efficiency of the solenoid was discussed, and further stating that it was the contractor's understanding that a new solenoid, the Leland, would be more efficient and more easily manufactured and obtainable than the one specified in the contract. To this the Government replied that no other solenoid had been approved and it could not authorize the substitution of any other solenoid. The evidence reveals that during this period another solenoid was undergoing tests and later was approved.

■ It is also true that shortly after the awarding of the contract to the Dye Machine and Supply Company on June 1, 1950, upon the request of the new contractor, the Government authorized it to substitute the Leland solenoid for the A–5 described in the original contract. At this time the new Leland solenoid had been approved. There was no obligation on the part of the Government to authorize substitution of any solenoid other than that described in the contractor's bid, and the contractor cannot now be heard to complain legally about its refusal to do so. If Hawthorn had been permitted to substitute the Leland solenoid, it is indicated by the evidence that its financial condition would have prevented it from obtaining it. Frankly, it is difficult to escape the conclusion, after reviewing all of the evidence, that the principal problem faced by the contractor was a financial rather than a mechanical one.

The Surety Company further contends it is not obligated because of the failure of the Air Force to award the contract to the lowest bidder which was the Connecticut Telephone & Electric Co. This company bid $9.15 on a base quantity of 11,476 units and $7.95 on the option quantity total of 27,864 units. The trouble with this contention is that there was a condition in the Telephone Company bid that delivery was not to begin until 210 days after the contract date. The invitation for bids accepted by Hawthorn provided for 500 per month starting December 1949 for each hand or 1000 per month. On December 7, 1959, the Government requested a delivery schedule, to which Hawthorn replied:

"We plan to ship 100 each hand for January and February, 1950; 250 each hand for March, 1950 and 350 each hand for April 1950, and then 500 each hand for the remainder of the schedule. We hope to be able to better the schedule of 500 each hand per month as work progresses."

Under this schedule the entire quantity of 16,438 units would have been delivered by July 1951.

■ In view of the fact that none of the releases had been delivered at the time the new contract was awarded, and the fact that, as the evidence reveals, the Air Corps was greatly in need of such releases, the time element was most important. Not only had there already been a delay of many months during which no releases at all had been delivered, but under the terms of the Telephone Company bid, it would have been 210 days or 7 months more before even a single unit would have been delivered. The bid of the Telephone Company was not in accordance with the offer of the Air Force, although it was a lower bid there was no duty or responsibility on the part of the Government to accept such bid for the purpose of minimizing defendants' damages.

We next come to the final and most important of defendants' contentions, that there were substantial changes in the offer to bid accepted by Dye and the offer accepted by Hawthorn. They cite United States v. Axman, 234 U.S. 36, 34 S.Ct.

736, 58 L.Ed. 1198 to sustain their contention. Assuming that there has been no deviation from the rigid principle laid down in this case, and it is the opinion of this court that there has been some, we have an entirely different state of facts than those presented to the court in the Axman case. In that case there was a substantial change that materially added to the cost of carrying out the terms of the contract as awarded to the second contractor.

The Surety Company has set out at the end of its brief in tabular form, the difference between the two contracts, the principal one of which is in the quantity of releases for monthly delivery. The original contract provided: "The Government desires delivery as follows: 500 per month starting December, 1949, each hand. If bidder does not state a different delivery schedule, schedule stated above will apply".

As heretofore stated, the bidder did state a different delivery schedule. In the Dye contract the number of releases for both hands was increased from 16,-834 to 27,864 divided into 15,087 and 12,777. In the Dye contract the exact number of releases were called for as in the Hawthorn contract with the option on the part of the Government to increase the number to 27,864. This was for the purpose of picking up the number that had not been delivered by Hawthorn, and anticipating the number to be needed in the future. The difference between the 16,834 in the Hawthorn contract and the maximum number in the Dye contract was optional on the part of the Government.

I am unable to find from the evidence that either the increased maximum number or the specified monthly delivery number of 800 in anywise influenced or affected the amount of the bid. Considering the contract as a whole, I am convinced that there was no substantial change or deviation between the original contract and the Dye contract. Dye bid on the same release described in the Hawthorn contract. The changes with respect to quantity and the ultimate number and the number for monthly delivery was not a substantial change or deviation under the evidence in this case.

I cannot escape the conclusion that Hawthorn undertook a job with which it was entirely unfamiliar and was unprepared either mechanically or financially to perform it. The plaintiff is therefore entitled to recover of the defendant American Surety Company, the sum of $29,259.64, with interest at the rate of six percent per annum from February 24, 1956.

The third party defendant Pierson signed the application as a principal. He thus becomes liable to the Surety Company for the amount it may be required to pay to the plaintiff because of the defalcation of the Hawthorn Manufacturing Company.