**SEABOARD LUMBER CO. (Penn Timber, Inc.), Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 37–86C.

**Consolidated under No. 610–84C.**

United States Court of Federal Claims.

June 30, 1999.

William Lenihan with Andrew Gala, both of Seattle, Washington, for plaintiff.

Gerald Alexander with Richard Nockett, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

■ This is an action brought pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601–613 (1994). Plaintiff challenges the Forest Service contracting officer's decisions terminating the Desperate Salmon Timber Sale contract and assessing damages against Penn Timber. This court has jurisdiction over plaintiff's claim because a timber sale contract is an express contract for the disposal of personal property as contemplated by the CDA. See 41 U.S.C. § 602(a); Mendenhall v. Kusicko, 857 F.2d 1378, 1379 (9th Cir.1988) (per curiam). The United States has filed a counterclaim seeking damages for breach. The matter is before the court on the parties' cross motions for summary judgment.

The court finds that, because plaintiff breached contract clause C8.642 by exporting during 1982 more than its 4,500 thousand board feet (MBF) quota of private logs, the Forest Service was entitled to terminate the Desperate Salmon contract and that plaintiff is liable for damages pursuant to contract clause B9.4. Because questions of material fact remain as to the extent of damages, that determination is preserved for trial.

## FACTS

Plaintiff, Penn Timber, Inc., was awarded the Desperate Salmon Timber Sale contract by the United States Forest Service on October 15, 1981. Plaintiff was to cut, remove, and pay for approximately 6,100 MBF of timber by the contract termination date of March 31, 1985.

Each year since 1974 the Department of Interior Appropriation Bill has included a provision to restrict the export of timber from federal lands. The appropriation bill for the fiscal year ending September 30, 1981 included the following language:

No part of any appropriation under this Act shall be available to the Secretaries of the Interior and Agriculture for use for any sale hereafter made of unprocessed timber from Federal lands west of the 100th meridian in the contiguous 48 States which will be exported from the United States, or which will be used as a substitute for timber from private lands which is exported by the purchaser: *Provided,* That this limitation shall not apply to specific quantities of grades and species of timber which said Secretaries determine are surplus to domestic lumber and plywood manufacturing needs.

Public Law, 96–514 [H.R.7724]; 94 Stat. 2957 at 2983, § 302, December 12, 1980 (emphasis in original). The Bill for the next fiscal year included exactly the same language. Public Law, 97–100 [H.R.4035]; 95 Stat. 1391 at 1415, 16, § 302, December 23, 1981.

Pursuant to that legislation, the Forest Service included paragraph C8.642 in the Desperate Salmon timber sale contract. Paragraph C8.642 deals with "Use of Timber" and includes a prohibition against substitution of federal timber for exported private timber in excess of quotas based on historic export levels. Paragraph C8.642 provides: "[U]nprocessed included timber shall not be exported from the United States nor used for substitution (as defined in 36 C.F.R. § 223.10) for timber from private lands exported by purchaser or an affiliate, directly or indirectly."

According to Forest Service regulations:

Substitution means the purchase of unprocessed timber from federal lands to be used as a replacement for unprocessed timber from private lands which is exported. Substitution occurs when (i) a person increases purchases of National Forest timber in any calendar year more than 10 percent above their historic level and in the same calendar year exports unprocessed timber from private lands in the tributary area; or (ii) a person increases exports of more than 10 percent above the historic level in any calendar year *while they have National Forest timber under contract.*

46 Fed.Reg. 80,528 (Dec. 5, 1980); *republished in* 46 Fed.Reg. 2611 (Jan. 12, 1981) (codified at 36 C.F.R. § 223.10(A)(4) (1981)) (emphasis added).

Although plaintiff did not export any private logs during 1981, it exported more than its 4,500 MBF quota of private logs in 1982 while simultaneously holding the Desperate Salmon timber contract to harvest timber in Olympic National Forest. Plaintiff reported its "inadvertent" violation of the substitution rules to the Forest Service on June 9, 1982. Forest Service personnel initially disputed plaintiff's understanding that a violation had occurred. Nevertheless, on January 17, 1983, the Forest Service terminated the contract for breach of contract provision C8.642, the export substitution provision. Clause C9.3 of the Desperate Salmon contract states: "If any breach is not remedied within the time limits [30 days] stated in B9.3, Forest Service may terminate this contract."

Clause B9.4 of the contract dictates how damages are to be calculated in the event of termination and resale, and states in pertinent part:

> In event of (a) termination for breach or (b) Purchaser's failure to cut designated timber on portions of Sale Area by Termination Date, Forest Service shall appraise remaining Included Timber, unless termination is under B8.22. Such appraisal shall be made with the standard Forest Service method in use at time of termination.
>
> Damages due the United States for Purchaser's failure to cut and remove such Timber meeting Utilization Standards shall be the amount by which Current Contract Value plus the cost of resale, less any Effective Purchaser Credit remaining at time of termination, exceeds the resale value at new Bid Rates.

The contract was resold and, on January 31, 1985, the contracting officer issued a final decision assessing damages of $943,231.51 * plus interest.

## DISCUSSION

Plaintiff argued in its briefs that the government had not given adequate notice of the 1981 rule change. During oral argument on April 19, 1999, however, plaintiff conceded that the new rule had been published in the Federal Register prior to the violation. (Tr. at 109.) In its briefing it conceded that, if the new rules were applicable, a technical violation occurred. (Pl.'s Cross Mot. for Summ.J. at 4–5.) Accordingly, the court has limited its consideration to the issue of what "without liability" means as that term was used in clause C8.642 of the Desperate Salmon contract.

### Termination "without liability"

■ Plaintiff argues that the contract language is ambiguous as to damages. It points to Paragraph C8.642, which concludes with the following statement: "For breach of this provision, Forest Service may terminate this contract *without liability* and may take such other appropriate action, including the imposition of such penalties as may be provided by laws or regulations." (Emphasis added.) Plaintiff interprets contract clause C8.642 as providing for contract termination without further penalty, at least with respect to the purchaser but, perhaps, to either party. Plaintiff explains that recision of the contract is itself a substantial penalty, depriving the purchaser of anticipated benefit and potential profit from substitution of the federal timber. It contends that "without liability" must refer to the breaching contractor, not the government, because a substitution violation is, by definition, a breach by the contractor, not the government, and the non-breaching party can always terminate without liability. In support of its assertion of ambiguity plaintiff notes that the Forest Service omitted the term "without liability" from clause C8.642 of its timber sales contracts starting in 1984. The government interprets "without liability" as applying only to the Forest Service. (D.Rep. Br. at 6.)

---

* Damages were calculated as follows pursuant to contract provision B9.4.

| | |
|---|---|
| $1,313,020.89 | (current contract price) |
| + 1,586.20 | (cost of resale) |
| − 3,439.95 | (effective purchaser credits) |
| − $367,935.63 | (resale value) |
| $943,231.51 | (damages) |

The court agrees with defendant that the only reasonable interpretation of this language is that the Forest Service has the option of terminating the contract without further liability to the breaching contractor for violation of the export substitution rules. Section C8.642 itself provides that the government may take "other appropriate action, including the imposition of such penalties as may be provided by laws or regulations." This language is inconsistent with the reading plaintiff proposes, which presumes that the timber company is exculpated. In addition, plaintiff's reading is inconsistent with general provision B9.4, which provides a method for calculating damages the government receives in the event it terminates for breach.

Plaintiff claims that this case and a related case, *Merrill & Ring,* also before the court, are the first examples of the Forest Service asserting damages for export substitution rather than simply taking away the contract. Plaintiff describes more egregious violations by another contractor that went virtually unpunished. Plaintiff also describes inconsistent enforcement policy at the Bureau of Land Management (BLM) and the Forest Service with respect to export prohibitions. Defendant's treatment of plaintiff in this case and in *Merrill* may indeed mark a significant change in its enforcement policy. The government was not obligated to assess damages under C8.642, however. It merely had that option. The court finds that the assessment of damages was consistent with the contract terms.

### Damages

■ Plaintiff argues that delay by the Forest Service in reselling the contract resulted in a lower resale price than if the contract had been resold promptly. The government notes that many contracts were being resold after default at that time and that under such circumstances delay until the resale date, May 18, 1984, was reasonable. Furthermore, the government counters, stumpage prices actually went up during the delay and, as a result, a later sale worked to plaintiff's benefit. (D.Rep. Br. at 13, 14.) Plaintiff's affiant, Robert Madison, states that timber prices were at an all-time low when the contract was resold. The court finds no explanation in the briefs for this apparent discrepancy between the trend of timber prices (perhaps felled and transported, maybe also processed) and stumpage (standing timber) prices. Material factual questions remain as to whether plaintiff was prejudiced by a delayed sale and, if so, whether the delay was reasonable. Accordingly these questions will be preserved for trial. At trial plaintiff will bear the burden of showing that the resale contract price was unreasonably low and by what amount. *See Engle Investors v. United States,* 21 Cl.Ct. 543, 552 n. 14 (1989); *Consolidated Airborne Sys. v. United States,* 172 Ct.Cl. 588, 348 F.2d 941, 948 (1965).

Plaintiff also argues that material changes in contract terms on resale resulted in a lower price being bid by the resale contractor so that recovery should be barred under *United States v. Axman,* 234 U.S. 36, 34 S.Ct. 736, 58 L.Ed. 1198 (1914). Plaintiff asserts that these material changes in contract terms included road allowances reduced by over $100,000 in the resale contract, increases in "Knutson Vandenberg" site improvement and brush disposal payments totaling over $60,000, and a 6½% excise tax liability not present in the original sale. The government characterizes these changes as altering merely the terms of payment, not the nature or scope of the work to be performed.

In his July 7, 1998 ruling in *Seaboard Lumber Co. v. United States,* 41 Fed.Cl. 401, 405, 409 (1998), Chief Judge Smith found plaintiffs' *Axman* defense adequate to withstand the government's motions for summary judgment and found that a trial must be held to determine whether the changes were sufficiently substantial and material to relieve plaintiffs of liability under *Axman* or whether it may be appropriate to reduce damages due to the changes and to what degree. Similar damages issues are raised here. Accordingly, the court preserves damage determinations for later trial.

### CONCLUSION

Defendant's Motion for Summary Judgment is granted in part as to liability. Plain-

tiff's Cross Motion for Summary Judgment is denied in part as to liability. The determination of damages will be made at trial.