**HOEL-STEFFEN CONSTRUCTION COMPANY**

v.

**The UNITED STATES.**

**No. 193–70.**

United States Court of Claims.

March 17, 1972.

James A. Dobkin, Washington, D. C., Atty. of record, for plaintiff; Abe Krash, Arnold & Porter, Washington, D. C., Donald K. Hoel, and Shook, Hardy, Ottman, Mitchell & Bacon, Kansas City, Mo., of counsel.

Mary J. Turner, Washington, D. C., with whom was Asst. Atty. Gen., L. Patrick Gray, III, for defendant; James A. Pemberton, Jr., Washington, D. C., of counsel.

Before COWEN, Chief Judge, LARAMORE, Senior Judge, and DAVIS, COLLINS, SKELTON, NICHOLS and KASHIWA, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

The Gateway Arch of the Jefferson National Expansion Memorial at St. Louis, one of the marvels of the midwest, was very difficult to build because of its unusual configuration. It stands 630 feet high, with two great legs, each made up of sections which are equilateral triangles. At the bottom, the three sides of the two legs (called north and south) are each 54 feet, the sides decreasing as the leg rises so that at the top they are only 17 feet. Inside each leg there are stairs, an elevator to the 380-foot level, interior steel members, conduits, and a transportation system which incorporates a 40-passenger "capsule train"; these capsules being mounted like Ferris wheel baskets, the seats remain level as the train proceeds up the rails inside the leg. At or near the top are observation platforms and tourist facilities.

The Arch was built in the first half of the 1960's by the Interior Department, and several contractors were involved. Important to this case are MacDonald Construction Company which became in 1962 the prime contractor for the Arch and the transportation system; Planet Corporation, with a subcontract from MacDonald for the capsule train; and plaintiff Hoel-Steffen Construction Company which contracted in 1965 with the Federal Government, at a price of over a million dollars, for various interior features of the Arch, including as one component the north leg ducts carrying hot and cold air to the observation area at the top. The structure of the inside of the leg, especially the increasing narrowness of the work-space, made it very difficult for all three of these contractors to carry on their projects simultaneously; in particular, plaintiff's channel for hoisting its ductwork was the shaft of the capsule train which the others also had to use.

The present claim is that, in the installation of the ductwork in the north leg (done by a subcontractor), over $150,000 of extra costs were incurred because the Government interfered by giving priority of access to the work-space to MacDonald and Planet, so that Hoel-Steffen's duct job was substantially delayed while the work of the others was allowed to progress.[1] This claim was presented to the Interior Board of Contract Appeals under the standard clause in plaintiff's con-

---

1. Only, the north leg is involved in this suit.

tract for "price adjustment for suspension, delay, or interruption of the work."[2] The Board rejected the claim (68–1 BCA ¶ 6922), and this suit followed.

On the view we take, it is unnecessary to give much of the detail of the history of the dispute. The placing of plaintiff's ductwork substantially began in the north leg in mid-April 1966, was discontinued from July 1, 1966 to mid-September 1966 (about September 23rd) by a strike (for which the defendant is admittedly not responsible), and then continued in the fall of 1966 and the winter of 1966–67. Plaintiff's position is that, both in the period prior to July 1st and during the time following the recommencement on September 23rd, the contracting officer interfered with and delayed the work by directing that MacDonald and Planet have preference in the use of the common working area during the normal work-day. This alleged interruption is said to fall under the suspension article (note 2, *supra*) because Hoel-Steffen had the right to expect that

MacDonald and Planet would have been finished, wholly or in large part, with their projects before the north leg ductwork was begun, so that plaintiff would have relatively free access to the interior and the channel through which the pipe-sections for the ducts would have to be hoisted (by a mechanism made somewhat intricate by the curvature of the Arch). The Board treated separately with the pre-summer (*i. e.* pre-strike) period and the post-strike resumption in the autumn, and we shall take the same course.[3]

■ 1. *Before July 1st:* As we understand the Board's decision, it denied the claim for the period prior to July 1st on two separate grounds: first, that plaintiff did not make a timely claim under the suspension clause (68–1 BCA at 32,019, 32,023), and, second, that in any event the "record will not support a finding that there was a suspension, delay or interruption resulting from an act of the contracting officer or any of his representatives during April, May or June 1966" (68–1 BCA

2. This clause, which was added to the Federal Procurement Regulations in January 1960, provides (25 F.R. 648):

"(a) The Contracting Officer may order the Contractor in writing to suspend all or any part of the work for such period of time as he may determine to be appropriate for the convenience of the Government.

"(b) If, without the fault or negligence of the Contractor, the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted by an act of the Contracting Officer in the administration of the contract, or by his failure to act within the time specified in the contract (or if no time is specified, within a reasonable time), an adjustment shall be made by the Contracting Officer for any increase in the cost of performance of the contract (excluding profit) necessarily caused by the unreasonable period of such suspension, delay, or interruption, and the contract shall be modified in writing accordingly. No adjustment shall be made to the extent that performance by the Contractor would have been prevented by other causes even if the work had not been so suspended, delayed, or interrupted. No claim under this clause shall be allowed

(i) for any costs incurred more than twenty days before the Contractor shall have notified the Contracting Officer in writing of the act or failure to act involved (but this requirement shall not apply where a suspension order has issued), and (ii) unless the claim, in an amount stated, is asserted in writing as soon as practicable after the termination of such suspension, delay, or interruption but not later than the date of final settlement of the contract. Any dispute concerning a question of fact arising under this clause shall be subject to the Disputes clause."

3. Plaintiff complains of this bifurcation, but it is not artificial and emerges naturally from the evidence and the relevant findings. For instance, the Board found that "in the fall of 1966, the effect of the transportation system work [the MacDonald-Planet work] on progress by the appellant's [plaintiff's] ductwork subcontractor was more disruptive" (68–1 BCA at 32,019), and also that the record "does show unquestionably * * * that from mid-October [1966] on, the degree of participation by Government officials in achieving the necessary coordination was increased greatly" (68–1 BCA at 32,021).

at 32,019). By-passing any consideration of the former point, we uphold the Board on the latter.

Hoel-Steffen had no contractual right to occupy the disputed space by itself, or to have priority over MacDonald and Planet. In several clauses, the contract made it absolutely clear that other work would be carried on and that plaintiff would have to coordinate its project with those companion jobs.[4] Plaintiff does not argue otherwise, but it does say that, before it bid, defendant's agents represented that MacDonald and Planet would be finished by December 1965, some time before the duct installation was to begin. However that may be, the important factor is that Hoel-Steffen voluntarily made a supplemental agreement with the Government on April 15, 1966—before the duct job was really started—requiring accelerated completion by plaintiff of its north leg work within 91 days (instead of the 270 days allowed under the original agreement); the defendant was to pay an additional sum for this acceleration. When this supplemental agreement was negotiated, plaintiff knew of course that MacDonald and Planet were still there; plaintiff was in full posture to judge the conditions at the time and, as the Board said, "obviously was required to make a complete reassessment of its position." 68–1 BCA at 32,017. Hoel-Steffen's contemporaneous correspondence proves that it understood in mid-April that it would have to mesh with the other contractors during normal hours—and that it accepted that postulate.[5] Plainly, there was to be no priority for Hoel-Steffen during the day.

On the other hand, there is nothing substantial to show that plaintiff was to be put in a subordinate position during ordinary working time; the supplemental agreement, while it may have contemplated priority for Hoel-Steffen at night and on weekends, did not say or suggest that the contractor was to be subordinated or deferred during "straight" time. The result is that, under their contracts, neither MacDonald-Planet nor Hoel-Steffen was to be preferred or downgraded, on balance, by the Government.

The question thus narrows to whether the defendant acted, during April–June 1966, so as to direct an unequal priority for MacDonald and Planet during the normal working period. It goes without elaboration, as the text of the clause shows and plaintiff agrees, that for the suspension provision (*supra*, note 2) to be triggered the Government must be involved—either through affirmative conduct or by failing to act when it is required to take steps under the contract—and there must also be an unreasonable period of delay. In the circumstances here, these two issues (with respect to April–June) are purely factual, and the Board squarely resolved both against plaintiff. It found in effect that there was no unreasonable delay and also that the defendant did not intervene in the manner plaintiff asserts.

The evidence on which the Board relied seems to us substantial. There were some oral complaints by both sets of contractors about interference by the other, but Hoel-Steffen did not request any time-extensions for delays or interruptions (except for a wildcat strike), and made no contemporaneous written complaints about delay through interference by the other contractors, either in progress reports or letters, even in a

---

4. "Scope of work provision, phases and completion of work" (contractor must take cognizance of other work and so plan its own work as not to interfere with the others) ; "Other contracts" (contractor will cooperate with other projects and not interfere with others) ; "Job conditions; work by others" (contractor acknowledges that it has taken account of the impact of other contracts) ; "Opera-

tions and storage areas" (contractor to have "rights in common with other contractors" and "shall coordinate his activities with theirs so as to cause a minimum of interference").

5. The Board's finding to this effect is also strongly supported by other substantial evidence.

troubled letter at the end of the period (it was dated July 1st) dealing with the impending strike which delayed the project until mid-September. In addition, the payrolls for the April–June period show a comparatively small amount of Saturday and full night-shift work, from which it can be inferred that the duct subcontractor did not feel that it was being unduly impeded during the normal hours. There was also evidence by Government people that the interested contractors mutually resolved their differences after some prodding and coaxing by the federal representatives. As the Board put it: "The situation seems to have been about what the top management of Hoel-Steffen and the ductwork subcontractor anticipated when the appellant [plaintiff] signed the supplement in the middle of April" (68–1 BCA at 32,019).

Plaintiff emphasizes the testimony of its witnesses that the ductwork was disrupted and delayed at the direct instance of government men—Mr. Chapman, defendant's project supervisor, was the one specifically named—on the job or through directives given at meetings of the contractors. The difficulty with reliance, in this court, on this oral evidence is that Mr. Chapman testified resolutely to the contrary; he denied giving any directives or orders to the contractors and insisted that he had merely brought the various parties together so that they could iron out their disagreements by themselves, without any government order or directive. With such a conflict in testimony, the Board was of course free to discount the versions given by plaintiff's witnesses of its dealings with Chapman. Though plaintiff presses us to do so, we cannot choose its witnesses over Chapman since there are no sufficient objective indications that their recital is correct and his false. *Cf.* Sternberger v. United States, 401 F.2d 1012, 185 Ct.Cl. 528 (1968).

The strongest piece of evidence for plaintiff is a statement by the contracting officer (Brown) agreeing, on cross-examination by Hoel-Steffen's counsel, that he had given MacDonald and Planet priority because the supplemental agreement allowed plaintiff to use overtime. Though this response is troubling, we cannot say that it necessarily overrides the cumulative impact of the several aspects of the record pointing against plaintiff. Mr. Chapman, not Mr. Brown, was the defendant's representative more directly involved in day-to-day operations,[6] and the former denied, on extensive examination, that any priority had been ordered by the Government. Mr. Brown's testimony was not the most clear—earlier he said "Well, I don't know about this priority business" and denied giving priority—and it may possibly have been that he was referring, in the statement on which plaintiff rests, to the arrangements mutually worked out by the contractors themselves, or perhaps to the period after the summer hiatus. At any rate, his testimony does not have much bearing on the separate question of whether plaintiff was in fact delayed during April–June for any unreasonable time (even assuming a government order for priority to MacDonald and Planet).

As this discussion has indicated, the upshot of our review of the record is that we cannot say that the Board's determination that there was no suspension (under the contract clause) during April–June 1966 is unsupported by substantial evidence or marred by legal error.

■ 2. *After September 23rd:* For this later period the Board denied any recovery because Hoel-Steffen failed to file a proper notice of claim: "We hold that the appellant can recover no costs incurred in performing ductwork in the North leg during the fall of 1966 or during the 1966–67 winter, because the notice required by the Suspension of Work

---

6. The company's witnesses did not cite Mr. Brown as personally giving any directives or orders as to priority.

clause was not given" (68–1 BCA at 32,-024).[7] The suspension clause declares flatly (note 2, *supra*) that "No claim under this clause shall be allowed (i) for any costs incurred more than twenty days before the Contractor shall have notified the Contracting Officer in writing of the act or failure to act involved (but this requirement shall not apply where a suspension order has issued) * * *." Plaintiff cannot argue that there was an actual suspension order here, but at most a constructive suspension occasioned by the Government's interference with the timing of the ductwork.[8] The notice requirement was therefore applicable, as the Board held. And since Hoel-Steffen resumed ductwork about September 23rd, the 20-day limit would call for notification to the Government by the middle of October if all costs attributable to a suspension in the fall of 1966 are to be recoverable. We think that such notification was given, that plaintiff qualified for consideration of its claim on the merits, and that the Board erred in holding to the contrary.

■■ Where the Board went astray was in failing to heed the different nature of the two separate notice requirements in the suspension clause (note 2, *supra*). The latter of the two is that there must be a written monetary claim "in an amount stated * * * as soon as practicable after the termination of such suspension, delay or interruption but not later than the date of final settlement of the contract." We have no doubt that plaintiff's claim letter of June 2, 1967, seeking over $150,000, was timely under this provision—and the Board did not suggest otherwise. The other notice specification, the only one really disputed in the case, is not directed at the presentation of a monetary claim in connection with the suspension clause, but only at notification to the defendant "of the act or failure to act involved." That inquiry is simply whether the contractor put the Government on notice of the government conduct complained about, so that the procurement officials could begin to collect data on the asserted increase in cost, and could also evaluate the desirability of continuing the delay-causing conduct. The Board seems to us to have neglected the precise nature of this notice requirement and to have transformed it, erroneously, into a provision for the filing by the contractor of a specific monetary claim under the suspension clause within 20 days of experiencing the increased costs.

■ Looking to the Board's own findings, we hold it clear that plaintiff put the defendant on timely notice "of the act or failure to act involved"—*i. e.* the Government's responsibility for the interference by MacDonald and Planet with Hoel-Steffen's work in the fall of 1966 and the ensuing winter. First, defendant's representatives received definite complaints, as to interference by the others, from Hoel-Steffen by the middle of October, and were quite aware of the problems with the work-space. See 68–1 BCA at 32,018–32,021, 32,024. There were apparently oral complaints and also two letters from plaintiff dated October 10 and 11 expressly concerned with this matter. A meeting on the point was held on October 7th with government agents. Change Order No. 5 (dated Oct. 17th), mainly concerned with delay because of labor problems, significantly added: "We are aware that progress on some portions of your work has been slowed by another contractor. This will be considered when you document the extent of such delay."[9] Thus, the Board's

---

7. The Board also made several remarks bearing on the merits of the claim but, as we point out *infra*, these were gratuitous observations and are not binding on the Board, the court, or the parties.

8. A suspension order was later issued with respect to the plaintiff's work on the south leg of the Arch.

9. Change Orders No. 6 (Nov. 16, 1966) and No. 7 (Dec. 22, 1966) gave time-extensions because of lack of access to the north leg and the need to share accessibility to the work area.

own opinion compels the conclusion that the defendant knew full well before the middle of October what was troubling plaintiff.

■ Second, we consider it equally plain that *the defendant knew, or should have known, that the Government's* authority and responsibility to remedy the difficulty had been triggered by plaintiff's complaints. The "operations and storage areas" clause (clause SP–9) of the plaintiff's contract declared: "The Government will decide any questions in dispute regarding performance of work, access to and clearing of site, and priority between various contractors." Obviously there was a dispute between the contractors as to access to the site, and when Hoel-Steffen brought this controversy to the Government's attention it was the contracting officer's duty to take action. See Hoffman v. United States, 340 F.2d 645, 649–651, 166 Ct. Cl. 39, 47–49 (1964); Paccon, Inc. v. United States, 399 F.2d 162, 170, 185 Ct. Cl. 24, 37 (1968). The Board was too rigid in demanding that the plaintiff specifically accuse the Government of "unreasonable or unfair measures in attempting to resolve the problem." It is enough, under the suspension clause, that the proof demonstrate that the defendant knew or should have known that it was called upon to act. The Board's own conclusions make this fact indisputable here. It found, for one thing, that the record "does show unquestionably" "that from mid-October on, the degree of participation by government officials in achieving the necessary coordination was increased greatly." 68–1 BCA at 32,021. The Board then found in precise and unmistakable terms: "The information in the letters [of October 10 and 11] about the delays caused by Planet Corporation's testing work does not include a reference to any contract clause; however, almost certainly it was given in the expectation that the Government would step into the dispute over access, so that it may be regarded as having invoked Clause SP–9, under which the 'Government will decide any question in dispute

regarding performance of work, access to * * * site, and priority between various contractors.' " 68–1 BCA at 32,-024.

■ Third, there was a written component of the notice, if such is essential (*cf.* Int'l Tel. & Tel. Co. v. United States, 453 F.2d 1283, 197 Ct.Cl. —— (1972)). When the General Services Administration promulgated this suspension clause, it issued FPR Circular No. 5 (dated January 20, 1960), in explanation of the new article, which pointed out: "No provision is contained in the clause whereby the contracting officer may waive a failure to comply with this notice requirement. However, this will not preclude adjustment where a notice of delay has been given by the contractor under *another clause of the contract.*" In this instance the latter was done by plaintiff's letters of October 10th and 11th which, in asking for time-extensions under the contract, referred directly to the delay caused by the other contractors' interference with Hoel-Steffen's access and to meetings with the Government on the problem. Change Order 5 (referred to above) served the same purpose when it acknowledged "that progress on some portion of your work has been slowed by another contractor. This will be considered when you document the extent of such delay." Even if the last sentence refers only to a time-extension (as defendant insists), it would be sufficient under FPR Circular No. 5, *supra,* since it would then be notice of delay "under another clause of the contract." It is impossible for us to read these documents, realistically, as confined solely to the alleged misconduct of MacDonald and Planet, as if the Government were not at all involved. The defendant's "acts or failures to act", in solving the dispute, were markedly implicated.

For these reasons, we hold that plaintiff gave proper notice under the suspension clause and is entitled to have its claim—with respect to the period after September 23, 1966—considered on its merits under the clause. To adopt the

Board's severe and narrow application of the notice requirements, or the defendant's support of that ruling, would be out of tune with the language and purpose of the notice provisions, as well as with this court's wholesome concern that notice provisions in contract-adjustment clauses not be applied too technically and illiberally where the Government is quite aware of the operative facts. See Copco Steel & Engineering Co. v. United States, 341 F.2d 590, 598, 169 Ct.Cl. 601, 616 (1965).

■ Since the Board placed its decision on the failure of notice, the case must now go back to the administrative level (on this part of the claim) for full consideration on its merits. *Cf.* Paccon, Inc. v. United States, 399 F.2d 162, 185 Ct.Cl. 24 (1968). There are some observations on the merits in the Board's opinion which defendant appears to cite as an alternative ruling, but we think, rather, that these comments are at most casual, incomplete dicta which should not have been made once it was decided, as it was, that adequate notice had not been given. When the case returns to the Board, neither that tribunal nor the parties will be bound by these gratuitous observations (including those on quantum). *Cf.* United States v. Utah Constr. & Mining Co., 384 U.S. 394, 419, n. 15, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). The Board will be free to decide *de novo* the issues relating to the merits of the claim on the present record, or if it desires on an expanded record reopened for further proof. Conversely, we disagree with plaintiff that the present record conclusively shows the liability of the Government. The evidence is not all one way and the issues call for further exploration by the fact-finding body. Of course, we intimate no view whatever on liability or on quantum (if that is reached).

■ It follows, too, that plaintiff's claim for breach of contract through defendant's interference with the work—set forth in Count 2 of the petition—must be dismissed. Since the suspension clause grants the necessary remedy under the contract (United States v. Utah Constr. & Mining Co., 384 U.S. 394, 415–

417, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); Merritt-Chapman & Scott Corp. v. United States, 439 F.2d 185, 193, 194 Ct.Cl. 461, 473 (1971)), the contractor cannot maintain a breach claim for which this contractual relief is available. See Morrison-Knudsen Co. v. United States, 345 F.2d 833, 170 Ct.Cl. 757 (1965); L. W. Foster Sportswear Co. v. United States, 405 F.2d 1285, 186 Ct.Cl. 499 (1969); La Crosse Garment Mfg. Co. v. United States, 432 F.2d 1377, 1380, 193 Ct.Cl. 168, 172 (1970).

Our conclusion is that defendant's motion for summary judgment is granted (and plaintiff's motion is denied) as to Count 2 of the petition (the breach claim) and also on Count 1 as to the period prior to July 1, 1966, but that plaintiff's motion on Count 1 is granted (and defendant's is denied) with respect to the period after September 23, 1966, to the extent that the Board's determination is set aside. Count 2 of the petition is dismissed. Further proceedings in this court are stayed, pursuant and subject to Rule 167, for a period of six months to afford plaintiff an opportunity to obtain administrative consideration on the merits by the Interior Board of Contract Appeals of the claim under the suspension clause with respect to the period after September 23, 1966.