SEABOARD LUMBER CO. (Merrill & Ring, Inc.), Plaintiff,

v.

UNITED STATES, Defendant.

No. 244–88C.

United States Court of Federal Claims.

July 30, 1999.

William Lenihan with Andrew Gala, Seattle, Washington, for plaintiffs.

Richard Nockett, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

This matter is before the court on the parties' cross motions for summary judgment. Plaintiff challenges the Forest Service Contracting Officer's decisions terminating the Ellis Lookout Timber Sale contract and assessing damages against Merrill & Ring. The United States has filed a counterclaim seeking damages for breach. The case was transferred to this judge on February 4, 1999. The motions are fully briefed and

were orally argued on April 19, 1999. For the reasons set out below, the court finds that the Forest Service's denial of plaintiff's request to transfer its contracts to a third party was not arbitrary, capricious, or contrary to law. Because plaintiff had breached contract clause C8.642 by exporting more than its 11,350 MBF quota of private logs during 1986, the Forest Service was entitled to terminate the Ellis Lookout contract. Plaintiff is liable for damages pursuant to contract clause C9.4. Questions of material fact remain as to the extent of damages. That determination is preserved for trial.

## BACKGROUND [1]

Plaintiff, Merrill & Ring, Inc., was awarded the Ellis Lookout timber sale contract by the United States Forest Service on September 6, 1983. Plaintiff was to cut, remove, and pay for approximately 20,500 MBF (thousand board feet) of timber from the Olympic National Forest in Washington State by the contract termination date of April 30, 1987. The contract termination date was later changed to August 30, 1987 to allow for delays in road construction.

Each year since 1974 the Department of Interior Appropriation Bill included a provision to restrict the export of timber from federal lands. The appropriation bill for the fiscal year ending September 30, 1983 included the following language:

> No part of any appropriation under this Act shall be available to the Secretaries of the Interior and Agriculture for use for any sale hereafter made of unprocessed timber from Federal lands west of the 100th meridian in the contiguous 48 States which will be exported from the United States, or which will be used as a substitute for timber from private lands which is exported by the purchaser.

Public Law No. 97–394 [H.R. 7356], § 302, 96 Stat. 1966, 1995–96, December 30, 1982.

Pursuant to that legislation, the Forest Service included paragraph C8.642 in the Ellis Lookout timber sale contract. Paragraph C8.642 deals with "Use of Timber" and

includes a prohibition against substitution of federal timber for exported private timber in excess of quotas based on historic export levels. It provides in part: "[U]nprocessed included timber shall not be exported from the United States nor used for substitution (as defined in 36 C.F.R. § 223.10) for timber from private lands exported by purchaser or an affiliate, directly or indirectly."

Some of the relevant contract terms are defined in the applicable Forest Service regulations:

> *Export means either direct or indirect export to a foreign country and occurs on the date that a person enters into a contract or other binding transaction for the export of unprocessed timber* or, if that date cannot be established, when unprocessed timber is found in an export yard or pond, bundled or otherwise prepared for shipment, or aboard an ocean-going vessel. An export yard or pond is an area where sorting and/or bundling of logs for shipment outside the United States is accomplished. *Unprocessed timber, whether from National Forest System or private lands, is exported directly when exported by the National Forest timber purchaser.* Timber is exported indirectly when export occurs as a result of a sale to another person or as a consequence of any other subsequent transaction.

36 C.F.R. § 223.10(a)(1) (1983) (emphasis added). This language remained the same in 1986. *See* 36 C.F.R. § 223.160(a) (1986).

The terms "substitution" and "person" are also defined in the Forest Service regulations:

> Substitution means the purchase of unprocessed timber from federal lands to be used as a replacement for unprocessed timber from private lands which is exported. Substitution occurs when (i) a person increases purchases of National Forest timber in any calendar year more than 10 percent above their historic level and in the same calendar year exports unprocessed timber from private lands in the

---

**1.** The facts are drawn from the parties' proposed findings of fact and from appendices attached to the parties' briefs.

tributary area; or (ii) a person increases exports of more than 10 percent above the historic level in any calendar year *while they have National Forest timber under contract.*

. . .

Person means an individual, *partnership,* corporation, association, or other legal entity and includes any subsidiary, subcontractor, parent company, *or other affiliate.* Business entities are considered affiliates for the entire calendar year when one controls or has the power to control the other or when both are controlled directly or indirectly by a third person during any part of the calendar year.

36 C.F.R. § 223.10(a)(4), (8) (1983) (emphasis added). These definitions were substantially unchanged in 1986 regulations.

Plaintiff, Merrill & Ring, filed a certification dated July 31, 1986, as required under the contract, in which it indicated that it exported or sold for export 10,381 MBF of private timber during the first six months of 1986. MRGC is a partnership formed by Merrill & Ring and an "entity" known as Green Crow. An addendum to the certification indicated that Merrill & Ring and MRGC exported or sold for export an additional 6,568 MBF and 2,538 MBF, respectively, of private timber, title to which they acquired from Green Crow. The Forest Service attributed this volume to plaintiff and its affiliate, MRGC, and concluded that plaintiff had exceeded its export quota of 11,350 MBF during the first half of 1986 by 8,138 MBF. According to plaintiff, however, the Green Crow volume should not be attributed to it. Plaintiff argues that it acquired only "nominal" title so as to be in formal compliance with its pier lease. Merrill & Ring's private pier lease from the Port of Port Angeles required that

Cargo moving to vessels moored at this facility is to be the product of M & R, Inc.

The facility will be operated as a private mill pier and not as a public pier or dock.

It is understood that Merrill & Ring, Inc. will not act as a log broker for shipments over the facility.

(Def.'s Supplemental App. at 5.)

Even if the Green Crow volume is excluded, plaintiff's total export volume still exceeded 11,350 MBF at some point before contract termination in December 1986, resulting in an export and substitution violation. Plaintiff's second line of defense is based on the fact that it unsuccessfully attempted to avoid that violation by transferring its contracts to a third party, Timber Marketing Limited Partnership (TMLP), a partnership formed specifically to receive those contracts. The formation of TMLP began mid-year but was not completed until August 1986. Plaintiff attempted to fashion the transfer to TMLP in the same manner as a prior transfer by Caffall Brothers which had been approved by the Forest Service.[2] The Contracting Officer, however, Mr. John Nelson, advised plaintiff in letters dated July 29 and September 30, 1986 that agency policy would not allow use of third-party transfers to remedy a possible or existing export and substitution violation. He also explained that the agency would not grant third-party transfers except where the purchaser "ceases all or a portion of its operations in an area and can no longer process the timber as contemplated at the time of the purchase."

Contract clause C8.642 bears indirectly on the transfer request. That section requires that "[u]pon request, all records dealing with origin and disposition of Included Timber and export of timber from private land shall be made available to Forest Service." By letter dated September 12, 1986, Contracting Officer Nelson requested that plaintiff provide an updated accounting of volume exported or sold for export. He renewed his request in a September 23, 1986 letter to plaintiff's Second Vice President, Glenn Wiggins, asking that the updated export information, required under the terms of the contract, be provided by September 30, 1986. In a letter to Mr. Nelson dated September 26, 1986, Mr. Peter Garrett, Chairman of the

---

**2.** Defendant notes that Caffall Brothers was not in violation of export and substitution rules when its contracts were transferred.

Board of Merrill & Ring, declined to provide the updated accounting of plaintiff's export activities until the report for the second half of 1986 was due. As of the denial of the transfer request, in other words, plaintiff had not updated its export data as required.

Plaintiff admits that its quota, 110% of its historic level in its tributary area, was 11,350 MBF for 1986. On August 18, 1986 and again on September 23, 1986 Contracting Officer John Nelson notified plaintiff that it had exceeded its export quota and was in breach. Clause C9.3 of the Ellis Lookout contract states: "If any breach is not remedied within the time limits [30 days] stated in B9.3, Forest Service may terminate this contract." Furthermore, the applicable regulations provide that for "violations of export and substitution requirements by the purchaser of timber from National Forest lands, the Forest Service may cancel the subject contract, debar the involved person or persons from bidding on National Forest timber, or initiate other action as may be provided by law or regulation." 36 C.F.R. § 223.10(e) (1983).

In a December 2, 1986 letter, plaintiff's counsel informed Theodore Stubblefield, Forest Supervisor, that Merrill and MRGC had exported 10,591 MBF of timber between July 1 and October 31, 1986. With the 10,381 MBF exported during the first six months, this brought plaintiff's total export volume for the year to 20,972 MBF. Regional Forester James F. Torrence, by letter dated December 16, 1986, then terminated the Ellis Lookout Timber Sale pursuant to contract provisions C8.642 ("Use of Timber," the export substitution provision), C9.3 ("Breach"), and 36 C.F.R. § 223.116(a)(1) (1986) which independently authorizes termination of contracts for "serious or continued violation of their terms." The cancellation was effective December 19, 1986.

Clause C9.4 of the contract dictates how damages are to be calculated in the event of breach and states in pertinent part:

In event of (a) termination for breach ... Forest Service shall appraise remaining Included Timber .... Such appraisal shall be made with the standard Forest Service method in use at time of termination.

Damages due the United States for Purchaser's failure to cut and remove Included Timber meeting Utilization Standards shall be the amount by which Current Contract Value, plus costs described below, less any Effective Purchaser Credit remaining at time of termination, exceeds the resale value at new Bid Rates.

The contract was resold and, on May 14, 1987, the Contracting Officer issued a final decision assessing damages of $362,423.51.[3]

One final contract provision figures in the debate, paragraph C8.642. That paragraph concludes with the following statement: "For breach of this provision, Forest Service may terminate this contract *without liability* and may take such other appropriate action, including the imposition of such penalties as may be provided by laws or regulations." (Emphasis added.)

## DISCUSSION

Plaintiff filed its underlying claim pursuant to the Contract Disputes Act (CDA), 41 U.S.C. §§ 601–613 (1994). This court has jurisdiction over plaintiff's claim because a timber sale contract is an express contract for the disposal of personal property as contemplated by the CDA. *See* 41 U.S.C. § 602(a); *Mendenhall v. Kusicko,* 857 F.2d 1378, 1379 (9th Cir.1988) (per curiam); *Spectrum v. United States,* 764 F.2d 891, 893 n. 3 (D.C.Cir.1985).

Plaintiff offers two defenses to what would otherwise appear to be violations of the export limitations provisions of the contract. The first is that the government improperly included Green Crow logs in the calculation of exported timber volume. The second is that the government should have allowed

---

3. Damages were calculated as follows pursuant to contract provision C9.4.

|  |  |
|---|---|
| $1,852,916.20 | (current contract value of remaining volume at termination) |
| +2,977.04 | (cost of resale) |
| +288,746.11 | (interest loss) |
| −$1,657,178.84 | (resale value) |
| −125,037.00 | (unobligated cash) |
| $362,423.51 | (damages) |

plaintiff to transfer its contracts to a third party, thereby averting a breach. The court will consider these defenses in order.

### Export and substitution violation

■ Plaintiff claims that the Forest Service's calculation that it exported 19,488 MBF during the first six months of 1986 is flawed in that 9,106 MBF of that amount was acquired "for accommodation purposes" from Green Crow and should not be counted against plaintiff's export quota. Plaintiff acknowledges that it formed a partnership, MRGC, with Green Crow, but denies that it had any financial interest in exports by its partner. Plaintiff insists that "[b]eyond naked title, [it] had nothing. It did not negotiate the export contracts for the Green Crow logs. It could not control the transactions. It received no money from the sale other than normal and customary log handling charges at plaintiff's log yard at market rates." (Pl.'s Cross Mot. Summ. J. at 15.) Accordingly, plaintiff argues that it was not in violation in June 1986 and should therefore have been allowed to transfer contracts to TMLP in August 1986.

There is no question that plaintiff actually purchased and then exported the Green Crow logs. The record includes a purchase order, invoice, and check from those transactions. Plaintiff also acknowledges in the addendum to its semiannual certification that title to the Green Crow logs was transferred to Merrill & Ring. Those logs were then exported by Merrill & Ring. On this basis alone the court finds that plaintiff violated the export and substitution regulations during the first six months of 1986. The fact that plaintiff took title to Green Crow's timber to "avoid a potential jurisdictional dispute over whose union employees could handle the logs, the Port's longshoremen or plaintiff's lumber and saw workers union workers," (Pl.'s Proposed Findings of Fact at 7, 8), does not alter the fact of sale by Merrill & Ring.

■ Even if the court were to accept plaintiff's contentions as to the unique character of its title to the Green Crow logs, however, plaintiff would still be in violation of the export and substitution regulations based on the treatment of exports by affiliates.

There is no question that, under the applicable regulations, MRGC was an affiliate of Merrill & Ring. Furthermore, as explained below, Green Crow is an affiliate of its partner, Merrill & Ring, and of the partnership, MRGC. Mr. Glenn Wiggins, Merrill & Ring's Second Vice President, testified at his deposition that MRGC "is the marketing arm of both companies," and agreed that Merrill and Green Crow pooled their efforts for economic and competitive advantage. He agreed that "a Japanese corporation would prefer doing business with a seller who can provide a larger as opposed to smaller volume of timber." (Wiggins Dep. at 53–55 in Def.'s Supplemental App. at 2).

The regulations define "substitution" in terms of the actions of a "person" and define "person" as, among other things, a partnership. 36 C.F.R. § 223.10(a)(8). The Uniform Partnership Act § 6(1), 6 U.L.A. 10 (1914 Act), defines "partnership" as "an association of two or more persons to carry on, as co-owners, a business for profit." MRGC is a partnership between Merrill & Ring and Green Crow. Under the regulations, "person" includes any "affiliate" of, in this case, the partnership. Blacks Law Dictionary 58 (6th ed.1990), defines "affiliate" as signifying a condition of being, among other things, "associated." The fact, therefore, that there were sound business reasons for plaintiff and Green Crow to go into partnership does not negate the collateral consequences of that affiliation. Merrill and Green Crow are both affiliates of MRGC and affiliated with one another by virtue of their relationship as partners. Moreover, even if Merrill and Green Crow were not affiliates by virtue of their partnership in MRGC, they were nevertheless affiliated with respect to the transactions at issue here based on the fact that they agreed to a transfer of title, allegedly for "accommodation purposes."

The Forest Service is charged with the administration of a federal statute effecting timber exports. This court gives deference to the agency's reasonable interpretation of that statute. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Chula Vista City School District*

*v. Bennett,* 824 F.2d 1573, 1579–80 (Fed.Cir. 1987). The court finds that the Forest Service's treatment of Merrill & Ring as an affiliate of Green Crow was reasonable based on the export and substitution regulations in effect during 1986. Furthermore, as an affiliate of Green Crow, plaintiff was properly treated by the Forest Service as the exporter of 19,488 MBF of timber during the first half of 1986, well in excess of its 11,350 MBF annual export quota. Thus, plaintiff breached the Ellis Lookout Timber Sale Contract.[4]

### Denial of transfer request

■ Irrespective of the Green Crow volumes, Merrill & Ring continued to export on its own account, and, in that way alone, eventually exceeded the export limit prior to termination. Plaintiff argues, however, that (excluding the Green Crow logs) it was not yet in breach mid-year in 1986 when it attempted to avoid a potential breach by transferring its contracts, and that it, therefore, should not be penalized for a breach that would never have occurred but for the government's improper denial of its transfer request. Because Forest Service policy does not allow third-party transfers to cure a breach, plaintiff's transfer defense is moot in light of the court's finding above that Merrill & Ring is an affiliate of Green Crow. Nevertheless, the evidence before the court indicates, as explained below, that plaintiff was in violation of Forest Service export and substitution rules, on its own, aside from its sale for Green Crow, before the Forest Service denied its transfer request.

Contracting Officer Nelson denied plaintiff's third-party transfer request on September 30, 1986, but he had indications well before then that a violation had occurred even without considering the effect of the Green Crow logs on plaintiff's export volume. Plaintiff's quota was 11,350 MBF per year. Even without counting the Green Crow logs, Merrill had already exported 10,381 MBF during the first six months. Furthermore, defendant could not have transferred to TMLP before that entity was formed in August 1986. During a September 9, 1986 meeting with Forest Service representatives, Merrill officials indicated that the company intended to continue to export at the same level it did during the first half of 1986 and that it would exceed its quota. The Forest Service later learned that plaintiff had exported, on its own, 20,972 MBF by October 31, 1986. If plaintiff exported at a consistent rate during the second half of the year it would have exported more than its quota even by the end of July when Contracting Officer Nelson first advised plaintiff that transfers could not be used to mitigate export violations that had already occurred. Plaintiff would have been even further in violation by the time its transfer request was officially denied on September 30, 1986.

Plaintiff suggested during oral argument that a violation could not have occurred until the filing of its next semiannual report after the end of the year. According to 36 C.F.R. § 223.10(A)(4) (ii), however, "[s]ubstitution occurs when ... a person increases exports of unprocessed timber from private land in any tributary area more than 10 percent above their historic level in any calendar year while they have National Forest timber under contract." Plaintiff only allowed the Forest Service to inspect its records for the first half of 1986, although, according to contract clause C8.642, purchasers are required to make their records available "upon request." The Forest Service's assumption

4. According to plaintiff, the Bureau of Land Management (BLM) and the Forest Service implement the law against substitution differently. Plaintiff explains that BLM prohibited both direct and indirect substitution from the start. *See* 43 C.F.R. § 5400.0–5 (1986). Plaintiff contends, however, that the "Forest Service rules prohibited substitution directly by a purchaser, but created a gaping loop-hole that allowed a purchaser to 'launder' national forest logs by selling them to an exporter (who was not a National Forest contractor) who would then use the federal logs at its mill as a substitute for exported private logs." (Pl.'s Cross Mot. Summ. J. at 13.) In contrast, plaintiff believes it is being penalized for what amounts to an insubstantial infraction based on a technicality.

These two agencies need not apply the statute in the same way. The Forest Service's application of the law is reasonable, although different than BLM's. When contracting with the Forest Service, plaintiff had to comply with Forest Service rules. In any event, it is not clear how tightening of the rules by the Forest Service would have helped plaintiff.

that Merrill was already in breach by September 30 was, thus, fully understandable.

Transfer of Forest Service contracts to third parties is not a matter of right. Under both the Anti–Assignment Act, 41 U.S.C. § 15 (1994), and Forest Service Regulations, 36 C.F.R. § 223.114, the government must consent to a transfer. In his July 29 and September 30, 1986 letters to plaintiff, Contracting Officer Nelson stated that it is the Forest Service's policy not to grant such transfers unless the purchaser "ceases all or a portion of its operations in an area and can no longer process the timber as contemplated at the time of the purchase." He decided not to grant the transfer, noting that Merrill intended to continue operations at or above current production levels at Port Angeles even after it stopped purchasing National Forest timber.

It was not unreasonable, under these circumstances, to reject a request for transfer when Forest Service policy did not permit third-party transfers to cure an existing breach and when the Contracting Officer reasonably believed that a breach had occurred. Moreover, although Forest Service policy allowed transfers where the purchaser "can no longer process the timber as contemplated at the time of purchase" (Nelson letter July 29, 1986 in Pl.'s App. to Opp'n Mem. at tab 19; Nelson letter to Garrett, Sept. 30 1986, Def.'s Supplemental App. at 18.), here, Merrill & Ring had indicated its intention to "continue operating its manufacturing facilities at Port Angeles at or above current production levels." (Nelson letter to Garrett, Sept. 30, 1986, Def.'s Supplemental App. at 18; Forest Supervisor Stubblefield's memo to Regional Forester, Def.'s App. at 26.) Under these circumstances the Forest Service acted within the limits of its discretion when it denied plaintiff's third-party transfer request with respect to the Ellis Lookout Timber Sale Contract.

### Termination "without liability."

The facts in *Merrill & Ring* are sufficiently similar to those in *Penn Timber, Inc.* that the court finds no need to revisit here its analysis of contract clause C8.642 and the meaning of the term "without liability." As established in the *Penn Timber* decision,

filed June 30, 1999, the Forest Service had the option, although not the obligation, to terminate Merrill & Ring's contract for breach without liability to the contractor. The Forest Service also had the option of calculating damages pursuant to contract clause C9.4.

### Damages

As in other consolidated cases, plaintiff in this case challenges the contract's damages provision, here clause C9.4. For the reasons given in *Seaboard Lumber v. United States*, 41 Fed.Cl. 401, 410–12 (1998), the court must reject plaintiff's argument that the damages clause is void as a penalty. *See also Manke Lumber (Mt. Adams) v. United States*, 44 Fed.Cl. 219, 227–28 (1999); *Engle Investors v. United States*, 21 Cl.Ct. 543, 549 (1989). As in *Seaboard* and *Engle*, here the court allows for the possibility that changes in the resale contract might change the amount of damages due. Damage clause C9.4 is enforceable as a starting point from which to begin damage calculations. Questions of fact remain for trial as to what extent, if any, damages should be reduced or eliminated due to changes in the resale contract.

As in other consolidated cases, plaintiff here argues that the government's damages claim is barred under *United States v. Axman*, 234 U.S. 36, 34 S.Ct. 736, 58 L.Ed. 1198 (1914), and its progeny because material changes in contract terms on resale resulted in a lower price being bid by the resale contractor. Plaintiff asserts that these material changes in contract terms included increased down payment, increased slash deposits, and reduced early harvest discounts. Plaintiff claims that the resale appraisal was manipulated downward by the Forest Service to chill bidding. Plaintiff argues that a resale contractor would have paid more for the contract under the same terms as the original. The government argues that these changes do not effect the nature or scope of the work to be performed. The government further counters that plaintiff has not met its burden of proving that the changed terms unreasonably reduced the resale price and, if so, the amount by which the price was unreasonably reduced.

In his July 7, 1998 ruling in *Seaboard Lumber*, 41 Fed.Cl. at 405, 409, Chief Judge Smith found plaintiffs' *Axman* defense adequate to withstand the government's motions for summary judgment and found that a trial must be held to determine whether the changes were sufficiently substantial and material to relieve plaintiffs of liability under *Axman* or whether it may be appropriate to reduce damages due to the changes. Similar damages issues are raised here. Accordingly, the court will set aside damage determinations to be pursued later at trial.

## CONCLUSION

Defendant's Motion for Summary judgment is GRANTED as to liability and denied in other respects. Plaintiff's Cross Motion for Summary Judgment is DENIED in all respects. The determination of damages will be made after trial.