**SEABOARD LUMBER CO. (Great Western Lumber Co.), Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 429–89C.**

United States Court of Federal Claims.

Nov. 22, 1999.

William Lenihan with Andrew Gala, both of Seattle, WA, for plaintiff.

Gerald Alexander with Richard Nockett, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Washington, DC, for defendant.

## OPINION

BRUGGINK, Judge.

This dispute arises out of a timber sale contract between the United States Forest Service and plaintiff, Great Western Lumber Company. After the contract expired without performance, the agency issued a final decision asserting reprocurement damages. Plaintiff brings this action pursuant to the Contract Disputes Act (CDA), 41 U.S.C. §§ 601–613 (1994), seeking to overturn that decision on the ground that the contract was illegal from the outset and should have been canceled. The government counterclaim attempts to enforce the final decision. The case was transferred to this judge on February 4, 1999. The matter is pending on cross motions for summary judgment. The matter has been fully briefed and orally argued. As explained below, the court concludes that the contract was not illegal and that plaintiff was not relieved of its duty to perform. Defendant's motion for summary judgment is thus due to be granted as to liability. The motion is denied in part, however, as damages on defendant's counterclaim cannot yet be determined.

## FACTS[1]

The relevant facts are undisputed. Great Western was second highest bidder at the 1979 auction of the Headwaters Timber Sale.

1. Other background can be found at *Manke Lumber Co. v. United States,* 45 Fed.Cl. 157 (1999); *Seaboard Lumber (Penn Timber) v. United States,* 44 Fed.Cl. 215 (1999); *Manke Lumber (Mount Adams) v. United States,* 44 Fed.Cl. 219 (1999); *Seaboard Lumber (Merrill & Ring) v. United States,* 44 Fed.Cl. 502 (1999); *Seaboard Lumber et al. v. United States,* 41 Fed.Cl. 401 (1998).

The timber was situated in the Mount Baker–Snoqualmie National Forest in the state of Washington. Plaintiff agreed to accept the high bid price and other terms of the sale after the original high bidder was disqualified. By the original terms of the contract, by March 31, 1984, plaintiff was to cut, remove, and pay for timber estimated to be 5,600 thousand board feet (MBF). The Forest Service later adjusted the contract termination date to July 31, 1987 to compensate for delays in road construction on the site. The contract expired uncompleted on July 31, 1987. Except for right-of-way clearing during road work, no timber was cut. The Forest Service found plaintiff in breach and assessed damages after resale of $328,983.47 pursuant to contract clause B9.4.

## DISCUSSION

Plaintiff filed its defensive claim pursuant to the CDA. That act gives this court jurisdiction over plaintiff's claim because a timber sale contract is an express contract for the disposal of personal property as contemplated by the CDA. *See* 41 U.S.C. § 602(a); *Mendenhall v. Kusicko,* 857 F.2d 1378, 1379 (9th Cir.1988) (per curiam); *Spectrum v. United States,* 764 F.2d 891, 893 n. 3 (D.C.Cir.1985).

### *Breach—road building*

Under contract clause C5.101, the Forest Service was to have completed road work on the subject property by September 30, 1981. Paragraph C5.101 provided that where "the actual date of road completion is one year or more after the [contractual completion date for road construction] Purchaser may request a rate redetermination." Paragraph C5.101 also required that the purchaser request any rate redetermination within 30 days after notification that road work was completed. On October 25, 1983 the Forest Service issued its notification that roads built for the Headwaters Timber Sale had been completed. Plaintiff elected to request a rate redetermination, however it did not do so until March 19, 1985, almost 15 months later.

Plaintiff's notice was thus plainly untimely. It relies, however, as discussed below, on a body of law dealing with defective notice to argue that, because the government was not harmed and was aware of the operative facts, plaintiff's late notice should be honored. Plaintiff claims that the requested adjustment in rates payable for the Headwaters timber sale would more than offset the damages the government claims and would have permitted Great Western to perform without a loss. Plaintiff characterizes the government's refusal to lower the rates as "a breach which, in effect prevented plaintiff's performance." (P.'s Cross Mot. Summ. J. at 6).

Defendant counters that contract clause B6.11 precludes constructive notice to the Forest Service. It states: "[n]otices by either party as to action taken or to be taken by the other respecting this contract shall be made in writing." Defendant also notes that the request for rate determination is discretionary on plaintiff's part, based on its assessment of the business climate. Under some circumstances, therefore, plaintiff might have elected not to seek rate redetermination, although that is unlikely in this case, as the market for timber had deteriorated.

The court agrees with defendant that the notice was untimely and therefore ineffectual. *Hoel–Steffen Const. Co. v. United States,* 197 Ct.Cl. 561, 456 F.2d 760 (1972), and its progeny, upon which plaintiff relies, are inapposite because they deal with notice of a different sort, given for a different reason. The plaintiff in *Hoel–Steffen* was one of three contractors working to build the Saint Louis Gateway Arch. All three contractors needed to work in the narrow confines of the north leg of the arch. Hoel–Steffen claimed that its installation of ductwork was delayed when the government gave priority of access to the other two contractors, causing Hoel–Steffen to incur extra costs. Our predecessor court described the inquiry at issue as "whether the contractor put the Government on notice of the government conduct complained about, so that the procurement official could begin to collect data on the asserted increase in cost, and could also evaluate the desirability of continuing the delay-causing conduct." *Id.* at 571, 456 F.2d at 766. It concluded that "the proof demonstrated that the defendant

knew or should have known that it was called upon to act." *Id.* at 572, 456 F.2d at 767.

Plaintiff also relies on *Russell Construction,* AGBCA No. 379, 74–2 BCA ¶ 10,911 and *R.R. Tyler,* AGBCA No. 381, 77–1 BCA ¶ 12,227, and other cases citing *Hoel–Steffen* to support a liberal treatment of notice requirements. *Russell* and *Tyler* involved Forest Service contracts to construct steel reinforced concrete bridges. In both cases the contractors encountered site conditions different than anticipated, which led to delays and additional expense. Contract terms called for timely written notice of a dispute, in *Russell,* and timely written notice of a claim based on a change order, in *Tyler.* The Board of Contract Appeals in *Russell* found that the Contracting Officer was aware that the contractor was claiming a differing site condition, despite the lack of formal written notice. In *Tyler* the Board found that the government had constructive, if not actual, notice of the bases for appellant's objections and that they might give rise to a claim for extra compensation.

The purpose of notice in these cases was to permit the government to resolve, for example, differing site conditions short of the necessity of a claim, or to mitigate costs to the contractor of a government-caused delay. What they have in common is the government's independent ability to react to knowledge of facts. Whether notice is constructive or written, therefore, is not critical. Instead, the question is whether the lack of notice caused any real prejudice to the government's ability either to defend against the contractor's claim, or to limit damages.

The notice called for in this case involved plaintiff's election or not of a contract option. It did not purport to call attention to physical conditions or other unexpected impediments to performance, any of which might have called for action or inaction on the part of the government. Instead, Great Western merely had the opportunity to indicate whether it wished to activate a rate redetermination. The Forest Service may have been fully aware of the earlier delay in building roads and the subsequent drop in timber prices. That knowledge would not have permitted the government to unilaterally adjust rates.

The only operative piece of information the agency needed was whether the contractor wanted to invoke the redetermination clause. The Forest Service was under no obligation to assume, without notice by plaintiff, that Great Western wished to have the rates redetermined. Extending this option beyond the contract-stipulated period would amount to an adjustment of the contract terms. Accordingly, the court concludes that plaintiff has waived its rights to rate redetermination by failing to exercise them within the prescribed time limit.

*Illegality*

■ Plaintiff also claims that it was excused from performance because the contract was illegal. According to plaintiff's interpretation of a provision of the National Forest Management Act (NFMA), 16 U.S.C. § 1604 (1994), the Forest Service could not award timber sales in areas where regeneration could not be expected within five years.

The portion plaintiff relies on provides in pertinent part:

(g) Promulgation of regulations for development and revision of plans; environmental considerations; resource management guidelines; guidelines for land management plans

As soon as practicable, but no later than two years after October 22, 1976, the Secretary shall ... promulgate regulations, under the principles of the Multiple–Use Sustained–Yield Act of 1960 [16 U.S.C. §§ 528–531], that set out the process for the development and revision of the land management plans, and the guidelines and standards prescribed by this subsection. The regulations shall include, but not be limited to—

. . . .

(3) specifying guidelines for land management plans developed to achieve the goals of the Program which—

. . . .

(E) insure that timber will be harvested from National Forest Service lands only where—

(i) soil, slope, or other watershed conditions will not be irreversibly damaged;

(ii) there is assurance that such lands can be adequately restocked within five years after harvest.

16 U.S.C. § 1604.

The applicable Forest Service regulations state that:

The approving officer will ensure that each timber sale contract, permit or other authorized form of National Forest timber disposal is consistent with the applicable land and resource management plans and environmental quality standards and includes, as appropriate, requirements for:

. . . .

(c) regeneration of timber as may be made necessary by harvesting operations;

(d) minimizing increases in soil erosion

36 C.F.R. § 223.30 (1998).

The statute and regulations thus contemplated that management plans be drafted to ensure that watersheds not be damaged and that adequate restocking of timber be assured. The statute also required that the Secretary obtain "inventory data on the various renewable resources, and soil and water, including pertinent maps . . . ." 16 U.S.C. § 1604(g)(2). In addition, consequences for non-compliance were spelled out. Regulations implementing section 1604 provided that timber sales contracts awarded after the passage of the NFMA "shall provide for cancellation . . . when they are significantly inconsistent with land management plans adopted or revised in accordance with § 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended [NFMA]." [2] 36 C.F.R. § 223.40 (1998). Accordingly, the Headwaters timber sale contract included such a clause, C8.2—Termination, which states:

"This contract *may* be terminated by the Chief, Forest Service, upon a determination that Purchaser's Operations would cause serious environmental damage or would be significantly inconsistent with

land management plans adopted or revised in accordance with Section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended [NFMA]."

(Emphasis added.) The contract also provided that the Forest Service "*may* make modifications in the [contract provisions] if and to the extent that such changes are reasonably necessary to make the contract consistent with the guidelines and standards developed to implement [the NFMA]." Clause C8.3, Contract Modification (emphasis added).

The land and resource management plan (LRMP) for the Mt. Baker–Snoqualmie National Forest was not, however, developed prior to the contract at issue. Indeed, Robert Snyder, USDA Soil Scientist, testified at his deposition that remapping of the soils pursuant to this section "went on a long time . . . probably [until] about '87." (D. Supp. App. Exh. 10, at 28). The investigation of soil conditions was apparently still underway as late as August 12, 1987 when Mr. Snyder wrote to the District Ranger that he would map out an area of S–8 (unstable soil), not previously identified, within the Headwaters contract area. This was 12 days after the Headwaters contract expired. The final plan was not approved until June 1990, three years after the Headwaters contract was terminated by the Forest Service on July 31, 1987.

Plaintiff contends that some sections of the Headwaters timber sale included over 10% Mountain Hemlock which could not be regenerated within five years. Albert Powell, Great Western's general manager, in an October 12, 1984 letter requesting contract termination, wrote that three units of the Headwaters contract "meet the Mt. Hemlock criteria of reforestation 'Potential Problem' under forest guidelines." He explained in his affidavit that "[t]he Forest Service simply lacked the empirical data to know whether the required regeneration could be obtained."[3]

---

**2.** In 1976, Congress amended the Forest and Rangeland Renewable Resources Planning Act of 1974 by passage of the NFMA, including the portions quoted above.

**3.** Defendant disagrees. Bernard Smith, District Ranger, in his January 3, 1985 response denying contract termination, wrote that "no reforestation problems [were] anticipated." This factual dispute does not preclude summary judgment.

Great Western requested contract cancellation based on problems with regeneration of Mt. Hemlock. That request was denied. The contract eventually expired unperformed and was resold at a net cost to the government, which then was assessed against Great Western. The Forest Service excluded portions of the Headwaters timber sale prior to offering it for resale. This was due to the presence of unstable soils, however, not due to regeneration concerns.

Great Western's current argument is that its non-performance should be excused because the Forest Service did not develop a LRMP for the Mt. Baker–Snoqualamie National Forest, and that, if it had, the contract would have been inconsistent with such a plan, due to the presence of mountain hemlock and unstable soils. The court disagrees. The Act provided for the gradual implementation of its goals. It directs, for example, that the secretary "shall begin to incorporate the standards and guidelines required by this section in plans for units of the National Forest system as soon as practicable after October 22, 1976 and shall attempt to complete such incorporation for all units no later than September 30, 1985." 16 U.S.C. § 1604(c); *see also* 36 C.F.R. § 219.10(e) (1998) ("As soon as practicable after approval of the plan . . . ."). Section 1604(c) also provides that "[u]ntil such time as a unit of the National Forest System is managed under plans developed in accordance with this subchapter, the management of such unit may continue under existing land and resource management plans." 16 U.S.C. § 1604(c); *see also* 36 C.F.R. § 219.29(a) (1998) (existing plans to remain in effect until new plans are implemented). The contract was not inconsistent with the existing plans for the Mt. Baker–Snoqulamie Forest. Land management plans and standards that could possibly have rendered the contract illegal were not in effect.

Nor can the court, from its jurisdictional and chronological remove, determine that: 1) a plan *should* have been developed sooner; and 2) that such a hypothetical plan should have excluded portions of the Headwater sale. The court has no authority to impose such different standards retroactively. It can only enforce the statute and contract as found. It either would have required broader injunctive powers than this court possesses to have mandated speedier implementation of plans and standards, or general federal question jurisdiction to review the substance of those standards, if adopted.

### Estoppel

■ Plaintiff alleges that its representatives met with Forest Service Supervisor J.D. MacWilliams regarding the regeneration problem and that MacWilliams indicated both that he would recommend that the contract should be canceled due to the regeneration problem and that his recommendation would likely be followed.[4] It is undisputed that Supervisor MacWilliams and Deputy Regional Forester Torrance agreed in March 1983 that the contract should be canceled to avoid an NFMA violation. Indeed, Mr. MacWilliams recommended cancellation to the Regional Forester on January 6, 1986. The Regional Forester, however, did not cancel the contract. Plaintiff asserts, and the court will assume, that it believed the contract would be canceled and, accordingly, elected not to buy out the Headwaters contract or apply for a five year extension.

Plaintiff's general manager, Albert Powell, acknowledged in his declaration that MacWilliams did not give any advice to Great Western about whether or not to buy out the contract. Even if he had, the Forest Supervisor's statements would not have bound the government or given plaintiff grounds for an estoppel argument. Despite MacWilliams beliefs and statements, exclusive authority to cancel lay with the Forest Service Chief.

For purposes of ruling on the motion for summary judgment, the court will assume that an argument could have been made at the time that certain tracts had large amounts of mountain hemlock. It is undisputed, however, that the existing plan did not exclude any tract within the sale. Nor is it disputed that the subsequent plan did not exclude any Headwaters tracts on this basis.

4. Defendant does not concede this assertion. That disagreement does not preclude summary judgment.

**410**

*See* Contract Clause C8.2, *supra.* MacWilliams' statements, in other words, amounted to no more than his own views. The government is not bound by representations which were outside the scope of his authority. *See USA Petroleum Corp. v. United States,* 821 F.2d 622, 626 (Fed.Cir.1987) (citing *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947)).

### Damages

■ Plaintiff argues that material changes in contract terms on resale resulted in a lower price being bid by the resale contractor so that recovery should be barred under *United States v. Axman,* 234 U.S. 36, 34 S.Ct. 736, 58 L.Ed. 1198 (1914). Plaintiff asserts that these material changes in contract terms included a down payment and midpoint payment requirement, and an excise tax liability not present in the original sale. The government characterizes these changes as altering merely the terms of payment, not the nature or scope of the work to be performed. Plaintiff also notes that the resale contract deleted 17 acres and 600 MBF from the sale area based on unstable soil conditions.

As in *Seaboard Lumber Co. v. U.S.,* 41 Fed.Cl. 401, 405, 409, the court finds plaintiffs' *Axman* defense adequate to withstand the government's motion for summary judgment as to damages. A trial must be held to determine whether the changes were sufficiently substantial and material to relieve plaintiffs of liability under *Axman* or whether it may be appropriate to reduce damages due to the changes and to what degree. Accordingly, the court preserves damage determinations for later trial.

### CONCLUSION

Defendant's Motion for Summary Judgment as to liability is granted. Plaintiff's Cross Motion for Summary Judgment is denied. The issue of damages flowing from defendant's cross claim will await trial.